OF

## THE STATE OF NEW JERSEY.

MAY TERM, 1890.

---

ALEXANDER T. McGILL, ORDINARY.

ABRAHAM V. VAN FLEET, VICE-ORDINARY.

---

CLIFTON WHARTON CLIFTON, appellant,

*v.*

FRANCES CLIFTON, respondent.

1. Opinions of witnesses concerning the testamentary capacity of a testator have weight as evidence only when they are based upon facts and occurrences which those witnesses detail before the court. They are received because the observation of the witnesses may have conveyed to them little, indefinable and almost imperceptible actions and expressions which language cannot adequately describe. Their value, at best slight, is enhanced or diminished according to the opportunities for observation and the honesty and intelligence of the witness.

227

Clifton *v.* Clifton.

2. The fact that the will is in itself natural and reasonable, is a fact corroborative of the correctness of the opinions of the subscribing witnesses, that the testator possessed testamentary capacity at the time of the execution. of the will.

3. The memory of a testator may be imperfect and impaired by age or disease, so that he may not be able to recollect the names, the persons or the families of those with whom he has been intimately acquainted, and he may, at times, do childish things, speak disjointedly, abruptly pass from one subject to another, or ask idle questions and repeat those which have before been asked' and answered, and yet possess capacity to make a will.

4. The capacity required in making a will is limited to the testator's comprehension of the property he is about to dispose of, the natural objects of his bounty, the meaning of the business in which he is engaged, the relation of each of these factors to the others, and the distribution that is made by the will. The amount of mental capacity must be equal to the subject with which. it has to deal.

5. The influence which the law denominates undue must be such as destroys. the testator's free agency by amounting to moral or physical coercion.

6. The influence of affection and kind offices, unconnected with fraud or contrivance, though it induces gratitude and testamentary recompense, is not undue.

On appeal from the Mercer orphans court.

*Mr. George Putnam Smith,* for the appellant.

*Mr. John F. Hageman,* for the respondent.

THE ORDINARY.

This is an appeal from a decree of the Mercer orphans court,. dated the 8th day of November, 1889, which adjudges a paper writing which had theretofore, on March 18th, 1889, been admitted to probate by the surrogate of that county as the last will of Marien Passage, to be such. last will, and also affirms the order and proceedings of the surrogate admitting it to probate,. and charges the appellant with the cost of the appeal.

The paper in question was made on the 29th day of July,. 1887, when the alleged testatrix was about eighty-three years of age, and a year and eight months before her death. Its admission to probate is resisted upon two grounds—*first,* because it is. alleged that, at the time of its execution, Miss Passage lacked

Clifton *v.* Clifton.

testamentary capacity; and, *second*, because it is insisted that it is the product of an undue influence exerted by the sole beneficiary under it.

By it the testatrix gives her entire estate to her niece, the respondent.

Marien Passage never married. For many years before her death she resided at Princeton, in the house which, with its furniture and the lot upon which it is erected, constitutes her entire estate.

The value of the real estate is about $12,000, but it is encumbered by a mortgage, the amount of which does not appear save as it may be estimated from the fact that the interest upon it amounts to about $200 a year; probably a sum between $3,000 and $4,000. The evidence discloses that the holders of the mortgage claim large arrears of interest upon the sum secured to be paid by it.

The appellant and respondent are brother and sister, the surviving children of Adelaide Clifton, a deceased sister of Miss Passage.

Prior to 1854 the respondent, then a mere child, went to reside with this aunt, and soon thereafter, when her father died, her mother and, a little later, her brother also took up their residence with the aunt.

Mrs. Clifton and her children had very little property, and, consequently, to a considerable extent, were dependent upon Miss Passage, and to eke out subsistence for the family thus thrown upon her, Miss Passage, from time to time, was obliged to take persons to board and lodge in her house.

After a few years Mrs. Clifton became totally blind, and so infirm and helpless that she was in need of constant attention.

In 1873, a gentleman named Ross, who appears to have been a connection by marriage, drew a will for Miss Passage, which bears date on the 4th day of December in that year, and has been offered for probate by the appellant. By it, the estate of Miss Passage, with the exception of a few insignificant specific legacies, was put in the appellant's hands, in trust, to hold for the benefit of Mrs. Clifton until her death or marriage, and then for the

Clifton *v.* Clifton.

benefit of two unmarried nieces of Miss Passage as long as they should remain unmarried and lived, and after the marriage or death of Mrs. Clifton, and the marriage or death of the nieces, to divide the principal among the then living children of Mrs. Clifton. The appellant was made executor of this will, and it was delivered to him and he has always carefully kept it within his control. If the disputed paper should be rejected, and the will of 1873 be admitted to probate, the appellant and respondent would, under existing circumstances, share the estate equally.

When the appellant completed his education, although he retained his residence in Princeton, he found employment else-where from time to time, and so bettered his condition that, between the year 1882 and the making of the instrument in dispute, he was able to send his mother small sums of money, aggregating, in five years, about $2,400, and with this money a nurse was procured for the mother, who relieved the respond-ent from much manual labor.

For many years immediately preceding her death Miss Passage suffered with rheumatic affections and dyspepsia, and, during the later years of her life, also with sciatica and cystitis, and became so great an invalid that she resigned the actual management of her household affairs to the respondent. Much of her time she was scarcely able to move about or to care for herself, and con-sequently, to a great extent, she became dependent upon others. Thus the burden and anxiety of unremitting attention to a neces-sarily close household economy, and the care of her invalid mother and aunt, devolved for years upon the respondent. It is not controverted that she managed most efficiently, and was self-denying, tender and devoted in her ministrations to both the invalids in her charge.

In the summer of 1887, the appellant, upon a summer vaca-tion, visited Princeton with a cousin, a Miss Finn, who, either then or subsequently, became his amanuensis. It is brought out as new matter upon the cross-examination of the respondent, and the appellant is therefore bound by it, that at that visit Miss Finn and appellant treated the respondent offensively, the effect of which, the respondent says, was to make her very unhappy,

Clifton v. Clifton.

but not revengeful. While her mind was in this condition, the appellant and Miss Finn went to a place called Cold Spring, remaining away from the 15th to the 30th of July.

It was during their absence upon this occasion that the disputed paper was executed.

The respondent testifies, that she visited Mr. Ross, who resided in Pennsylvania, in 1882, and that upon that occasion he sent a message by her to Miss Passage, to the effect that Miss Passage should change her will and leave her entire property to the respondent; and that after some hesitation, caused by the delicacy of delivering such a message, she told Miss Passage what Mr. Ross had advised, and, after some consideration, Miss Passage assented to the advice as right, and said that she would act upon it. The subject was not again mentioned, but in 1885, in an attack of sickness, Miss Passage exclaimed to the respondent, "Nannie, my will!" giving the impression that she then had in mind her previously-expressed determination to make the advised change.

Since childhood Miss Passage had been a friend of Paul Tulane, a wealthy and philanthropic resident of Princeton. The principal tie between them was the fact that she had cared for his mother in her last illness. In appreciation of his friendship, many years before her death, Mr. Tulane promised her, and thereafter regularly paid her, an annuity of $300. After a time it became necessary for her to have a large sum of money, and she borrowed it from Mr. Tulane, securing repayment by a mortgage upon her property. After the mortgage was given no interest upon it was demanded, but the annuity was reduced from $300 to $100, the understanding being that the difference paid the interest upon the mortgage. Mr. Tulane died in April, 1887, intestate, and later, administrators of his estate were appointed, one of them being Mr. George O. Vanderbilt, a member of the bar of this state.

On the 28th day of July the respondent went to Mr. Vanderbilt's office to speak with him about taxes upon the mortgaged property, and was then informed that Mr. Tulane had not left any memoranda to show that credit for the payment of interest

upon the mortgage had been given, and, consequently, that it would be the duty of the administrators to enforce the payment of all the apparent arrears. The respondent states that she almost fainted when Mr. Vanderbilt made this announcement, and that with hesitation, because of fear of the effect upon her aunt, she repeated the bad news to her. She says that Miss Passage looked up in astonishment, but merely remarked, "Is it possible?" but later, the same day, came to the respondent and bade her go to Mr. Vanderbilt the next morning and ask him to come and draw her will. She says that she endeavored, but without avail, to persuade her aunt to defer the will-making until the appellant should return, but the next morning, finding her aunt still determined, she obediently went to Mr. Vanderbilt's office and delivered the message. Mr. Vanderbilt returned with her, and, after taking Miss Passage's instructions, returned to his office, had the will prepared, and, an hour or two later, came back in company with his brother. The will was then executed in compliance with all the statutory requirements, the respondent, Mr. Vanderbilt, his brother, and Miss Caroline Salomons, a lady who had then boarded with Miss Passage for more than thirty years, being present. Mr. Vanderbilt and his brother were the subscribing witnesses. Neither of them had known Miss Passage before that day.

In speaking of the interview at which the instructions for the preparation of the will were given, Mr. Vanderbilt says that Miss Passage came to the room into which he was shown, assisted by the respondent; that she appeared to be an infirm old lady, possessed of sufficient ability to converse connectedly upon an important subject; that, according to his practice, he talked with her to satisfy himself as to her mental capacity, and, being satisfied that she possessed requisite ability to make a will, he took her instructions. He remembers that, without difficulty or assistance, she gave the instructions, and that she did not exhibit either nervousness or unwillingness. His interview, he thinks, at that time lasted about ten minutes. An hour or two later he again called, this time to superintend the execution of the will. His brother and the respondent and Miss Salomons were present. He read

Clifton *v.* Clifton.

the will to Miss Passage and explained its meaning, and she then assented to it and signed it without difficulty, fully satisfying him that she understood the full import of the business in which she was engaged. His brother, Albert Vanderbilt, corroborates him, and adds that he too was satisfied that Miss Passage fully comprehended what she was doing. After the execution of the will there was some general conversation for a few minutes, which the senior Vanderbilt does not recall, but which his brother Albert says related to Mr. Tulane. The brothers both agree that their interview with Miss Passage, at the execution of the will, did not exceed a half hour. Miss Salomons, who had known the testatrix for forty or more years at the time when the disputed paper was executed, and who had been an inmate of her house, and in daily contact with her for the ten years immediately preceding that time, and who has impressed me as being a most candid, impartial and reliable witness, says that after Mr. Vanderbilt had finished reading the will, he asked Miss Passage if she was satisfied with it, and Miss Passage replied, "Perfectly so;" and then Mr. Vanderbilt asked if there was any other person to whom she desired to leave anything, whether she wished to provide legacies of any kind, and she replied, "No; all my house and all my property in the house I leave to my niece, who has been to me a daughter; I wish nobody else to have it." Miss Salomons states that she spoke slowly and deliberately, and appeared to be "perfectly herself." This witness further says, that when the will was read the testatrix, unaided, but with difficulty, because of her physical infirmities, walked to a stand and wrote her name, and after the execution joined in a general conversation about Mr. Tulane. She also expresses the opinion that Miss Passage thoroughly understood what she was doing. The testimony of the respondent is corroborative of the testimony of the others who were present at the execution of the will, and goes more minutely into the details of the general conversation between Miss Passage and Mr. Vanderbilt.

As the ascertainment of the mental condition of Miss Passage, at the very time of making the disputed paper, is the object

of inquiry here, the testimony of the four witnesses already referred to is the most important in the case. Next to it should stand the testimony of two servants who were in the house when the will was executed, and who have been produced and sworn in behalf of the appellant. The first of these is Mary Hardy, a colored woman, who came from North Carolina and has been the appellant's housekeeper for several years. She came to Princeton with him about the 1st of July, 1887, and remained there during that month, taking the place of Mrs. Clifton's nurse, who had gone away for a short time. She testifies that immediately before the will was made Miss Passage had been very sick, so that she was confined to her bed; that she remembers that the day before, and again on the day on which the will was executed, the respondent sent Harriet Stewart, another colored servant, for Mr. Vanderbilt twice, at one time with a note; that Harriet stated to her that she was running after a lawyer to come around, "Nannie wanted to make Miss Mary change her will;" and that she herself heard the respondent direct Harriet to "tell them to be sure to come to-morrow; it must be done to-morrow." She further states, that when the lawyer came the respondent went to Miss Passage and told her to come on, that she was all ready, and Miss Passage said, "All ready for what?" and the respondent replied that "the gentleman was here to do the business." She then adds that Miss Passage did not pay any attention to the direction to come on,

"but she just sat there. So Mrs. Friedly goes and gets a white tie and an apron, and takes her by the arm and pulls her through the pantry and into the parlor, and then they left the door half opened; and then, after awhile, I passed backwards and forwards, and the door was closed tight; I was giving her medicine—beef tea; I passed backward and forward, and they kept me going there two hours and a half."

Harriet Stewart, the other colored woman, testifies that she was sent, at a time that she cannot fix, to ask Mr. Vanderbilt to call upon the respondent; that she went, and Mr. Vanderbilt stated that he could not come, and that she was again sent with a note for Mr. Vanderbilt, which he said he would answer

through the post-office. Upon cross-examination this witness says she remembers nothing connected with her mission to Mr. Vanderbilt about a will. Of Mary Hardy's testimony she says : "She said I said something about a will, but I don't recollect it; if I did recollect it I would come out and say I did say it; but I don't recollect it."

The proofs fully disclose that the occasion upon which Harriet Stewart was sent to Mr. Vanderbilt antedated the making of the will some days or weeks, and that it was wholly connected with matters pertaining to the mortgage upon Miss Passage's property. It is equally well established that during the execution of the will the doors leading into the parlor were opened, and that the time occupied in the execution did not exceed thirty minutes. The apparent contradiction as to the time occupied in the execution of the will may possibly to some extent be explained by the fact that it may have been two hours and a half between Mr. Vanderbilt's call for instructions and the execution of the will; but this explanation would exhibit the falsity of the statement of Mary Hardy, that she passed backwards and forwards in waiting for two hours and a half, especially in face of the undoubted proof that between the instructions and the execution Miss Passage was out of the parlor.

Weighing the testimony of this witness in the light of these contradictions, her employment by the appellant, and her evident zeal in his behalf, I think it should be received with caution, and only partially, if at all, believed.

Harriet Stewart says that she saw the respondent assisting Miss Passage to the parlor, and adds that Miss Passage " did not pay much attention to anything."

Both these women speak as to the condition of the testatrix after the will was executed. Mary Hardy says that she appeared to be quite feeble and sat at the library window looking very weak, and that the witness asked her if she did not want to lie down, and Miss Passage replied, " Yes, I should like to come down to my room and lie down," and the witness assisted her to her room. Harriet Stewart says that Miss Passage sat at the window and called to her that people were stealing oranges from

the front of a grocery opposite, and that the witness told her she was mistaken, but that she persisted and attempted to raise the window and inform the proprietor of the store.   There is no proof that Miss Passage was not correct in her assertion that some one had taken oranges, and it is by no means impossible that she was not correct in the statement.   I see no ground for believing that it was the fancy of a disordered brain.   Neither this occurrence nor the reply to Mary Hardy, that she wished to lie down, indicates absence of intelligence.   On the contrary, I think that they rather serve to corroborate the testimony of those who were present at the execution of the will, that she was in full possession of her mental faculties.

Another class of witnesses is composed of those who speak concerning the general condition of Miss Passage about the period of the making of the disputed paper.   Among them is the appellant, who says that after 1884 her mind became childish, her memory began to fail, she would forget words and be unable to converse connectedly upon any subject; would stand absent-mindedly folding little rags, and at times would play with a doll. He says that in 1887 her memory was about gone; that she was weak and yielding and completely dominated by the respondent. Upon cross-examination he expresses the opinion that she knew perfectly that he was alive, and that her sisters, Mrs. Pierson and Mrs. Clifton, and her brother were alive, and that her sister Mrs. Pierson was a widow, and that the respondent continually waited upon her, and at her death would be dependent and helpless in the world.   Mary Hardy corroborates this testimony as to Miss Passage's habit of folding rags, as to her forgetfulness, inability to carry on continued conversation upon one subject and as to her playing with a doll, adding that upon one occasion while Miss Passage was looking out of a window she directed the witness' attention to some men who stood on the opposite side of the street, and asked what they were, and, upon being informed that they were men, asked what men were.   The same witness states that the night before the will was executed she left Miss Passage for a few moments alone in her room, and when she returned found that she had completely undressed herself, and

that when the witness asked her what she meant by doing so, she found that Miss Passage was so confused that she did not realize her situation.  Harriet Stewart and Miss Finn corroborate the statements of Mr. Clifton about the habitual folding of rags and the playing with a doll, and Miss Finn adds that at table Miss Passage would eat with her fingers, dipping them into whatever might be on her plate.  The remaining witness produced by the appellant, Julia E. Cruz, was taken by him to Princeton in the years 1884, 1885 and 1886 to minister to his mother's relief.  She claims to possess the power to relieve pain by placing her hand upon the affected part.  She says she came to Princeton as the appellant's friend, and there offered her services and ministered, with some success, to Mrs. Clifton and Miss Passage. She describes in Miss Passage the physical weakness and mental impairment which usually attends advanced age, and says that sometimes she was brighter than at others, likening her mind and memory to the flaring up of a candle.  She says that Miss Passage spoke to her of having made a will.  "She sometimes said," the witness adds, "that her sister was provided for as long as she lived, and after that her nieces and nephews.  She spoke with a great deal of fondness of them both, especially her nephew; she seemed to idolize him."  This witness saw Miss Passage last in 1886, and she expresses the opinion that she had then become childish.

Miss Salomons says that, without doubt, Miss Passage's mind weakened as she grew older; that she became forgetful of names, as old people generally become; that her table manners, which had always been offensive to the witness, grew worse; that she had a doll in the summer of 1887, when she executed the paper in dispute, but that she did not then play with it as she did during the last year of her life, and that she did constantly fold small pieces of rags, arranging them in her work-box; that her remembrance of things that happened long ago was clear, but as to things which happened in middle life, it was indistinct; but, notwithstanding the general weakening of her mental and physical powers, the witness thinks that when she executed the will of 1887, she was capable of intelligently disposing of her property.

She recalls an instance, in January, 1887, when Miss Passage expressed a desire to send some pictures to a sick child, and afterwards went into the parlor where it was cold, without assistance, to look for them and found them. The respondent found her in the cold room and remonstrated with her for going into it, and she replied that she was determined that the child should have the pictures. She further states that she gave Miss Passage a testament, in large print, which she constantly read until long after the execution of the disputed instrument. She says that she used to hear Miss Passage read from that testament to her blind sister, Mrs. Clifton. She also refers to Miss Passage's intelligent appreciation of the death of Mr. Tulane, in April, 1887.

Mrs. Julia Jones boarded with Miss Passage for a few months in 1884 and 1885, and left Princeton and did not return until October, 1887, when she called upon Miss Passage. Of this call she says :

"I sat on the sofa some distance from her, and she got up and walked to me and I saw that she was feeble, and I gave her my arm, and she sat in a little rocking-chair near the furnace, and I sat near her and we talked for some time, but I cannot tell you what about. She talked more slowly than she had done, and that was the only difference. She waited a little longer when I asked a question before answering. Her mind was as clear as it ever was. She talked slowly and thought more. We did not leave the room until somebody else came in."

Another witness, the Rev. Mr. Hinsdale, the pastor of the church which Miss Passage attended, says that he was accustomed to visit her two or three times a year, and that he remembers that from 1885 to 1887, after the funeral of Mr. Tulane, he thought her to be quiet and retiring, but in possession of her mental faculties. He says that he did not visit her for the purpose of testing her mental capacity, but that, so far as he observed, he saw nothing to cause him to question it. He recalls one occasion when she conversed very intelligently with his wife upon the subject of flowers.

Miss Julia Smith, a neighbor who had known her intimately and lived near her for half a century or more, called upon her

Clifton *v.* Clifton.

in October, 1887, and found her sitting alone at the dinner-table, finishing her dinner.   Miss Smith says that she then talked most intelligently.   After a few minutes the appellant called the witness into the parlor to see some wall-paper, and while there he and she talked about an old rocking-chair before them, and as the appellant was saying he did not know its history, Miss Passage appeared, unassisted, at the door, and said: "You do not know its history?   I can tell you its history.   It was given to me by Mrs. Dwight when she lived in Robert Voorhees's house." This witness expresses the opinion that, in 1887, Miss Passage possessed abundant mental capacity.   The respondent explains that her aunt's folding rags was not an act of aimless inanity, but a source of occupation; that she would fold them up and also roll up pieces of tape and other things and arrange them neatly in her work-box, so that they might be had for use when needed. As to the doll, she says that her brother, the appellant, brought it to her aunt, and although her aunt may have dressed it in 1887, she did not play with it, to any extent, until the last year of her life.

Almost every witness examined has expressed an opinion as to the capacity of Miss Passage to make and execute a will.   Such opinions are of little weight unless the witnesses make it appear that they are based upon facts and occurrences which they detailed before the court.   It is for the court, upon the facts disclosed in the case, under well-settled rules and guides, to pronounce the opinion whether the testator is competent or not, yet the opinions of witnesses are received because their observation may have conveyed to them little, indefinable and almost imperceptible actions and expressions which language cannot adequately describe.   Their weight, at best slight, is enhanced or diminished according to the opportunities for observation and the intelligence and honesty of the witness.   The subscribing witnesses occupy a position of advantage before the court.   They are called by the testator as disinterested and impartial persons for the purpose of attesting, after his death, to the circumstances under which the solemn instrument was executed.   The court therefore pays particular regard to the facts they state as then

Clifton *v.* Clifton.

occurring, and even to their opinions as to the testator's competency. But the position of the subscribing witness is not free from criticism. In *Turner* v. *Cheesman, 2 McCart. 243,* Chancellor Williamson says : " If the subscribing witness is a stranger, which is sometimes the case, called upon to meet the exigencies of the moment, and having no opportunity in the sick chamber to ascertain and judge of a man's capacity, his opinion is not certainly entitled to as much weight as that of a friend who saw the testator about the same time, and who was afforded an opportunity of conversing with him and testing the sanity of his mind. * * * The means which he enjoys of forming a correct opinion give weight to his opinion."

It is observed that, at the execution of the will in controversy, the subscribing witnesses were strangers to Miss Passage, who saw for the first time and conversed with her less than an hour. That fact certainly detracts from the value of their opinion as to her capacity; but, on the other hand, when it is remembered that the senior of them is a member of the bar, who realized and understood the responsibility of his position, and, because of her age, took pains to converse with her to satisfy himself as to her capacity, his conclusions become entitled to more than ordinary regard and consideration.

An important circumstance in this inquiry is the fact that the will itself is natural and reasonable, a fact that is corroborative of the opinions of the subscribing witnesses. *Pancoast* v. *Graham, 2 McCart. 274.*

The will of 1873, family associations, and the testatrix's repeated declarations, fixed the appellant and respondent and their mother as the primary objects of Miss Passage's bounty. After the will of 1873 was made, the appellant became an independent, self-sustaining man, who not only supported himself, but also substantially contributed to the maintenance of his mother. The respondent's prospects in life also changed; she had given years of her life and, as Miss Salomons says, had " worn herself out " in ministering to the comfort of her aunt and mother, and it had become manifest that in a short time she would be left alone to combat the world. The tender, loving

Clifton v. Clifton.

and unfailing devotion of years assured the testatrix that her mother would continue to be her care as long as she lived. The property that once the testatrix had thought proper to divide between the brother and sister, was mortgaged for a large sum, and large arrears of interest upon that claim were claimed, and it thus became apparent that, after the payment of the mortgage, but little more than she had intended originally for the respondent would remain. Under such circumstances, what could be more natural and reasonable than to give the remnant of her property to the respondent, even to the exclusion of the self-supporting nephew?

The proofs as to Miss Passage's general and occasional condition do not countervail the testimony as to her condition at the time she signed the paper here in dispute. They exhibit the usual concomitants of old age, but fall short of establishing fixed imbecility. At times intelligence was dim, but there were occasions, as one of the witnesses suggested, when it would flare up as clearly and brightly as it ever existed.

The capacity required in making a will is limited to the testator's comprehension of the property he is about to dispose of, the natural objects of his bounty, the meaning of the business in which he is engaged, the relation of each of these factors to the others, and the distribution that is made by the will. The amount of mental capacity must be equal only to the subject with which it has to deal. It has repeatedly been held by the courts of this state, that the memory of a testator may be imperfect, also greatly impaired by age or disease; that he may not be able to recollect the names, the persons, or the families of those with whom he has been intimately acquainted, or that he may at times do childish things, speak disjointedly, flying abruptly from one subject to another, or ask idle questions, and repeat those which have before been asked and answered, and yet may possess capacity to make a will. *Lowe* v. *Williamson, 1 Gr. Ch. 82; Andress* v. *Weller, 2 Gr. Ch. 604; Whitenack* v. *Stryker, 1 Gr. Ch. 8; Sloan* v. *Maxwell, 2 Gr. Ch. 563; Stackhouse* v. *Horton, 2 McCart. 202; Turner* v. *Cheesman, 2 McCart. 243; Boylan* v. *Meeker, 2 McCart. 310; Moore* v. *Blauvelt, 2 McCart. 367; Harris*

Clifton *v.* Clifton.

v. *Betson, 1 Stew. Eq. 211; Sutton* v. *Morgan, 3 Stew. Eq. 629; Errickson* v. *Fields, 3 Stew. Eq. 634; Eddy's Case, 5 Stew. Eq. 701; S. C. on appeal, 6 Stew. Eq. 574; Kise* v. *Heath, 6 Stew. Eq. 239; Rusling* v. *Rusling, 8 Stew. Eq. 120; S. C. on appeal, 9 Stew. Eq. 603; Brady* v. *McBride, 12 Stew. Eq. 495; Waddington* v. *Buzby, 18 Stew. Eq. 173.* In *Boylan* v. *Meeker,* above cited, where the capacity was adjudged to be sufficient, Mr. Justice Potts said of the testator : " Indeed, while the weight of evidence is, I think, clearly in favor of his capacity, when in ordinary health and free from causes of excitement, yet it was, no doubt, to some extent, a fluctuating capacity, greatly impaired at times, and occasionally sinking into the imbecility of second childhood."

The subject with which Miss Passage had to deal was not a difficult one. Her estate consisted entirely of the property upon which she had resided for very many years. She had already selected from her kindred those who should be the recipients of her bounty. The problem before her was simply, whether the disposition she had already made should stand. She knew of the appellant's prosperity, of the respondent's dependence, and of the encumbrance upon her property. It was a simple mental process to reason and determine that what remained of her estate should go to the dependent respondent.

I have no doubt that Miss Passage possessed sufficient capacity to make the disputed will.

Upon the second ground of the contest, it is insisted that the *indicia* of undue influence are so numerous and well marked that a presumption against the instrument, which has not been successfully rebutted, is raised. The fact that the testatrix was confessedly weak in body, and, at times, in mind, and almost wholly dependent for the thousand-and-one little comforts upon the respondent, and the circumstances that the respondent, having been offended by her brother, in his absence, and on the day before his return, herself brought a lawyer to her aunt's house, assisted the aunt to an interview with him, remained at the interview, was again present at the execution of the will which gave her the entire estate to the exclusion of her brother, and that she

Clifton *v.* Clifton.

kept the transaction secret until after her aunt's death, are relied upon as such *indicia.* I do not hesitate to say that, at least, these circumstances demand close and suspicious scrutiny. They have been explained, and I have most carefully considered the explanation, and am satisfied that it is both natural and reasonable. Miss Passage's estate was originally small. Since she had provided for the division of it, her sister had become blind and a hopeless invalid. Her nephew had become comparatively prosperous. The life of her niece had been so given up to the service of her aunt and mother that, as I have before said, it became apparent that in a short time, when they would die, she would be homeless and, in a measure, helpless. Besides, the estate had been reduced in value by a mortgage. The draftsman of her former will had called her attention to the propriety of changing that instrument, and she had already acquiesced in his judgment. At this juncture came the announcement that, in addition to the principal of the mortgage, arrears of interest, for years, amounting to hundreds of dollars, were demanded. It is not strange that such an announcement should determine her to at once terminate her procrastination, and immediately make the intended change in her will. The resolve once made, to whom should she turn for assistance in carrying it out? Naturally to the one upon whom she was accustomed to depend. The respondent's presence at the instructions for the will and at the execution of that document, when prepared, I think is reasonably attributed to her concern for her aunt's physical welfare. Her failure to apprise her brother of the making of the will is naturally explained.

The evidence shows that the brother had treasured the will of 1873 and that she knew that he wished a share of his aunt's property. Two weeks before he had not hesitated to wound her feelings, and she justly felt that knowledge of his loss would lead to his, perhaps unmeasured, condemnation of her. Hence she shrank from making the announcement, but realizing the importance of having it made, begged her aunt to do it for her. For some reason the aunt avoided the disclosure, and, it may be, wisely, as the existence of the contest in this case indicates. In

disposing of this charge of undue influence, I think that I may say of the respondent, as was said by the court of errors and appeals of the appellant in the case of *Waddington* v. *Buzby, 18 Stew. Eq. 173, 177,* that her conduct, her character, and her relationship to the testatrix, do not warrant the charge of undue influence, without more direct and certain evidence.

That influence must destroy free agency by amounting to moral or physical coercion. Our courts have uniformly held, that the influence of affection and kind offices, unconnected with fraud or contrivance, though it induces gratitude and testamentary recompense, is not undue. *Den., Trumbull,* v. *Gibbons, 2 Zab. 117; Humphrey's Will, 11 C. E. Gr. 513; S. C. on appeal, sub nom., Jenkins* v. *Moore, 12 C. E. Gr. 567; Eddy's Case, 5 Stew. Eq. 701; Collins* v. *Osborn, 7 Stew. Eq. 511; Wheeler* v. *Whipple, 17 Stew. Eq. 141; S. C. on appeal, 18 Stew. Eq. 367; Dumont* v. *Dumont, 1 Dick. Ch. Rep. 223.*

I will affirm the decree of the orphans court, with costs.