77 N.J. Super. 380 (1962)
186 A.2d 527
IN THE MATTER OF THE PROBATE OF THE ALLEGED WILL OF NATHAN N. RASNICK, DECEASED.
Superior Court of New Jersey, Essex County Court, Probate Division.
Decided November 8, 1962.
*382 Mr. Alfred C. Clapp argued the cause for appellant (Messrs. Clapp & Eisenberg, attorneys).
Mr. William Krueger argued the cause for respondents.
MATTHEWS, J.C.C.
Nathan A. Rasnick died a resident of Essex County, New Jersey, on June 14, 1961. On June 28, 1961, there was presented for probate an alleged last will of decedent dated December 10, 1948. A judgment admitting this will to probate was entered by the Surrogate on June 28, 1961. On July 12, 1961 an appeal was taken from said judgment and the matter was brought before this court for disposition.
At the hearing on the appeal, inspection disclosed that the will admitted to probate provided for the disposition of decedent's entire estate among his three sisters with certain other dispositions to members of his family which are not pertinent here. At the time of his death, decedent left surviving him a widow, the appellant Pearl Rasnick, whom he had married during the spring of 1955. The widow sought to prove a subsequent document purporting to be a later will of the decedent. There was proffered on her behalf a carbon copy of the alleged will which was dated April 21, 1959. Under this writing, all of decedent's estate was left to his widow. The reason for the production of a carbon copy of the will (which was conformed) was given as follows:
On April 22, 1959, decedent and his wife appeared at the law offices of Jennie E. Precker, a member of the bar of this State, who was the scrivener of the alleged will dated April 21, 1959. The visit to the law office had been forewarned by a telephone call to Miss Precker on the evening prior to the visit. Upon arrival at the office, decedent and his wife were admitted to Miss Precker's office, and she handed the original *383 of the alleged will to the widow. The widow thereupon took the will out of its envelope and, suddenly, in a fit of temper, tore the signature portion of the last page off the document and handed the remainder of the will to her husband, saying substantially, "here is your signature, show it to your sisters." Shortly thereafter, both decedent and his wife left the office.

I.
The sisters of decedent who would benefit under the first will (hereinafter referred to as respondents) objected to the production and offer of the carbon copy of the alleged subsequent will claiming that such proof is prevented by the rule of evidence which bars one who voluntarily, without mistake or accident, destroys primary evidence, from producing and using secondary evidence to prove that which was destroyed. It is claimed on behalf of respondents that this broad rule should be applied by me here, and in support of this argument there is cited to me the opinion of Chancellor Green in Wyckoff v. Wyckoff, 16 N.J. Eq. 401, 402 (Ch. 1863). At the hearing, I overruled the objection of respondents stating my reasons for such action on the record. In the interest of clarity and to document that ruling, I deem it advisable to set forth reasons in support of my ruling herein.
The rule cited by respondents seems to have first come into our jurisprudence in the case of Broadwell v. Stiles, 8 N.J.L. 71, 3 Halsted 58 (Sup. Ct. 1824). Broadwell v. Stiles involved an action on a promissory note. Stiles had in his possession a note drawn in his favor by a third party. Broadwell had received the proceeds of the note, the same having been endorsed, it was claimed, to him by Stiles. At the trial, Stiles sought to prove that the endorsement made by him was a forgery. When the note was produced, it appeared that the endorsement had been erased, admittedly by Stiles. The trial court had permitted testimony as to the alleged forgery. On the appeal, the former Supreme Court ruled that the admission of such testimony was erroneous and stated in support of *384 such holding that he who voluntarily, without mistake or accident, destroys primary evidence thereby deprives himself of the production and use of secondary evidence. In applying this rule, the former Supreme Court observed that Stiles by defacing the allegedly known genuine signature effectually deprived Broadwell of the benefit of witnesses acquainted with the handwriting of Stiles, who if they had seen and examined the signature might well have satisfied the jury that the evidence produced by Stiles was untrue. The court further observed that to admit the evidence under such circumstances is as repugnant to principles as to deny a party the cross-examination of the witnesses of his adversary.
In Wyckoff v. Wyckoff, supra, the court was faced with a problem involving the destruction of the only copy of a last will of the decedent there involved. It appeared that decedent who was a female had certain property which she had derived from her father many years prior to her death. The gift to the decedent provided that if she died without issue, her unexpended share of the bequest was to go over to his surviving children. Some years after her father's death, decedent executed a will under which she made defendant her sole executor and residuary legatee. Thereafter, decedent died without issue. Immediately following decedent's death, her property was claimed by the executors of her father as being part of his estate under the limitation which he had made under the gift to his daughter. It was the legal opinion of consultants to defendant that the action of the father's executor was correct. Defendant became convinced that his decedent, therefore, had no property to dispose of by her will since all of her property had reverted to her father's estate. While under this belief, he destroyed the will in question. The Chancellor was satisfied beyond controversy that the will was destroyed by defendant under the honest belief that the testatrix had no right to dispose of the property.
In referring to the rule as laid down in Broadwell v. Stiles, supra, the Chancellor stated, (16 N.J. Eq., at p. 402):
*385 "The mere proof of the loss or destruction of an instrument does not, as a matter of course, let in the party to give secondary evidence of its contents. `He who voluntarily, without mistake or accident, destroys primary evidence, thereby deprives himself of the production and use of secondary evidence.' Broadwell v. Stiles, 3 Halst. R. 58.
If the destruction was accidental, or if it occurred without the agency or assent of the party offering it, secondary evidence is admissible. But if the instrument was voluntarily destroyed by the party, secondary evidence of its contents will not be admitted, until it be shown that it was done under a mistake, and until every inference of a fraudulent design is repelled. * * *" (Citations omitted.)
He then went on in his opinion to apply the rule to the facts of the case before him in this manner (16 N.J. Eq., at p. 404):
"* * * It is proved past all controversy, that the will was destroyed by the witness under the honest belief that the testatrix had no right to dispose of the property, and that consequently the will was worthless. Nor is there any rational ground to infer any fraudulent purpose in the destruction of the will. The party by whom it was destroyed is the executor of the will, and the legatee of a large portion of the estate. He was not one of the next of kin of the testatrix, and could gain nothing by her intestacy. There is a suggestion in the testimony of one of the witnesses, that the will might have furnished some evidence of the amount of property in the hands of Wyckoff, and that this was the real motive of its destruction. The answer to this suggestion is, that the will of the testatrix could furnish no competent evidence of the amount of her property in the hands of her agent, he not being the scrivener; much less could a will, made in 1853, furnish any competent evidence of the amount of her property in 1859. A more decisive answer is, that when an adequate motive for the destruction of the will is assigned by the party, and clearly established by the evidence, the court will not, upon mere conjecture, impute an inadequate and dishonest motive."
Respondents here have urged that under the testimony which established the destruction of the alleged second will, there is nothing to show that the action of the widow was, in fact, an accident or a mistake. In addition, they urge that under the circumstances, the motive of the widow in destroying the will bespeaks fraud, and clearly indicates her intention to deprive the court of the original document for reasons best known to her.
*386 There is no question but that the action of the widow in tearing the signatures off the will was done in a fit of rage and in a voluntary manner. There is nothing to show that the widow believed that her husband had no property to bequeath or devise or that there was any reason why she should believe that the document in question was worthless. I do not believe, however, that the rule of evidence here sought to be invoked constitutes a legal strait jacket such as would operate to deprive a court of its inherent right to seek out and determine the ultimate truth in a matter before it. Professor Wigmore in his work on evidence, Vol. IV, Sec. 1198, calls the rule, as invoked here by respondents, inconsiderate. He states that the rule has been laid down with the extreme case in mind, and then criticizes the rule as applied unconditionally in all cases. Broadwell v. Stiles is cited by the professor as an extreme case. He observes that it is obvious that there may exist many cases of intentional destruction of primary evidence which do not present extreme features. For example, the intentional destruction might clearly appear to have been natural and proper, or it might be merely open to bare suspicion of fraud. In such cases, Professor Wigmore urges that evidence of its contents should be received, subject to comment on its circumstances. This approach to the rule, he terms to be a liberal one.
Without belaboring the issue, I am satisfied that the rule laid down by the Chancellor in Wyckoff v. Wyckoff, supra, does not establish in our jurisdiction the inconsiderate rule referred to by Professor Wigmore. It is apparent that the strict application of the rule in Broadwell v. Stiles, supra, was warranted under the facts of that case. Cf. Vanauken v. Hornbeck, 14 N.J.L. 178 (Sup. Ct. 1833). Indeed, Professor Wigmore terms the case one of extreme features. In Wyckoff, however, while the Chancellor found that the document was destroyed by mistake, the mistake found was one of law and not one dealing with the actual physical destruction of the document in question. It seems to me that the Chancellor was more interested in whether an adequate motive *387 could be found for the act of destruction and whether that motive when found eliminated any reasonable inferences of fraudulent conduct. I do not believe that the rule requires a court to find destruction of primary evidence by accident or mistake in fact before it will entertain secondary evidence to prove the contents of that which has been destroyed. The object of inquiry in such a case, it seems to me, is a full explanation of the circumstances surrounding the destruction, and if the circumstances as disclosed are free from the suspicion of intended fraud, secondary evidence is admissible. The controlling fact which must govern the admissibility vel non of the proffered evidence is the cause or motive for destruction. Of course, it may well be that under given circumstances the method of destruction may give indication of the true motive for the act performed. With these principles in mind, I turn now to the circumstances leading up to and surrounding the destruction of the original of the proffered document.
Decedent was an athletic, intelligent, attractive male. During the year 1952, he suffered the first of a series of cerebral episodes which caused a gradual deterioration of his physical well-being. After the first stroke, decedent was able after a recuperative period, to return to the practice of dentistry in which he was then engaged. Just one year to the day after the first stroke, decedent suffered a second stroke which caused him to be hospitalized for two months. As a result of the second stroke, decedent became hesitant in his speech and some paralysis developed on the left side of his body. After this stroke, decedent was unable or, at least, advised, not to continue in the practice of dentistry. A third stroke followed in April of 1954, and a fourth in November of that year. There is no question but that decedent's physical condition had been weakened to some extent by the episodes described.
It is apparent that he was the fair-haired boy in the eyes of his three sisters who are respondents here. Their testimony convinces me without doubt that decedent was literally *388 smothered with affection and sheltered, by some standards, beyond reason.
During the period immediately following the fourth stroke, decedent deeded over his real property and transferred his personal properties to the control of a corporation which was formed by his sisters. From the date of that transfer, decedent apparently took no active part in his own financial activities, relying on his sisters who furnished him with income derived from his property, as he required it. In June of 1955, decedent married Pearl who is now his widow. In July and December of 1955, decedent suffered slight strokes which did not require hospitalization. In October 1956, decedent suffered a severe stroke from which, it is conceded, it took him longer to convalesce. After the October 1956 episode, decedent experienced no further cerebral episodes until June 17, 1960.
At the time that decedent and Pearl were married, decedent's property was under the control of his three sisters as aforementioned. At various times during the period extending from shortly after the time of the marriage until July of 1959, decedent discussed with his wife and others his desire to have his properties transferred back into his name. The subject matter of the transfer of the properties was one which apparently caused decedent and his wife aggravation. The testimony satisfies me that decedent sought the help of others to induce his sisters to retransfer his property, and that he did very little by way of direct approach to the sisters in this regard. The sisters deny that decedent desired the property transferred back to him or that he requested any of them to make such transfer. Decedent's efforts with respect to the retransfer of his property included discussions with lawyer friends, an accountant who was an in-law, and the Rabbi of the temple in which he was married. A number of witnesses have testified that decedent had mentioned to them that his sisters had control of his property and that he desired it to be transferred back to him. Decedent's widow stated that on several occasions she discussed the question of retransfer of *389 the property with her husband, but that she did not like to press the issue because she knew that it upset him.
In the midst of these circumstances, decedent's widow states that decedent requested her to arrange to have Miss Precker draw a will for him. She said that she had no knowledge of any preexisting will, and that her husband had never mentioned such a document to her. The widow called Miss Precker, who was her cousin, and made arrangements for an appointment for the purpose of drawing a will.
On April 20, 1959 decedent and his wife appeared at Miss Precker's office. Decedent and Miss Precker went into her office and there decedent advised Miss Precker that he desired to write a will leaving all of his estate to his wife Pearl, naming her as his executrix. No mention was made in this conversation of his sisters or brother. Decedent was advised to return the next day for execution of the will. On the 21st, he and his wife appeared at Miss Precker's office. The widow remained in the waiting room and decedent, Miss Precker and her brother, Abraham, who is a member of the bar of this State and associated with his sister, repaired to the library where the contents of the will were discussed. Thereafter, decedent was given the original document and he went to another room in the office suite presumably to study the document in private. Decedent then returned and the will was executed in compliance with the statute with the two Preckers signing as witnesses. The original will was retained by Miss Precker and placed in an envelope which in turn was placed in her office safe.
After executing the will, decedent and his wife parted company, she to run some errands and he to visit the home of his sister Rose. The testimony as to just what occurred upon decedent's arrival at his sister's home is somewhat difficult to reconcile. Bessie Kirsch, one of decedent's sisters, says she was present when decedent arrived. She says that he was agitated and that the words he uttered were unintelligible except that she recalls decedent uttered, "Jennie Precker  Pearl  Will." Both sisters testified that each attempted *390 to calm decedent. Rose states that she called decedent's widow. An argument ensued during which the conversation was terminated by Pearl's hanging up the phone. Rose then called the third sister, Nettie (Mrs. Oxman), who is a member of the bar of this State. Mrs. Oxman then called Jennie Precker and she states that she was assured by Miss Precker that no will had been executed. Miss Precker denies that she made such a statement. Nettie then called Rose ostensibly to inform her of her conversation with Jennie Precker. The testimony is difficult to reconcile since decedent had gone from the front of Jennie Precker's office in downtown Newark to Rose's home by taxicab without assistance and, under the evidence adduced before me, without anyone's giving the cab driver instructions as to his destination. Again, if decedent was so unintelligible and only uttered the words which he had, and bearing in mind the testimony as to the conversation between Pearl and Rose, it is difficult to understand just what precipitated the telephone call by Nettie to Miss Precker and the subsequent discussion with respect to a will. I have no doubt but that decedent informed his two sisters upon his arrival at the home of Rose that a will had been executed in favor of Pearl and that this was fully understood by the sisters.
After these events, decedent returned to his home and, thereafter, there was some discussion between him and his wife concerning the events which had transpired since their visit to Jennie Precker's office. As a result of this discussion, Mrs. Rasnick called Miss Precker and informed her that she and her husband would be at Miss Precker's office in the morning to pick up the original will. The visit of the next morning was occasioned by the events hereinbefore described, during which the widow destroyed the signature portion of the original will. Following the tearing of the original will, both the widow and Miss Precker testified that there was an embarrassed silence and that the decedent then stated, "I am sorry." Miss Precker testified that in an effort to soothe the situation she told both the decedent and his wife *391 that if the will was destroyed he could draw another one, or if he did not draw another will and this will was destroyed, he would die intestate. Decedent never executed another will.
The argument advanced by respondents with reference to the factual circumstances in support of their objection to the admission of testimony concerning the will of April 1959, is somewhat difficult to follow. Respondents argue that the widow has failed to meet the requirement that she rebut every inference of fraud with respect to the destruction of the document. Ignoring the family background and circumstances as I have set them forth herein, respondents state that since Miss Precker advised the decedent that his will was now destroyed and his wife would take by intestacy, decedent was misled by erroneous legal advice. As a result of this and because neither the widow nor Miss Precker knew of the existence of the prior will, the widow was therefore in a position after the death of decedent to make application for administration by reason of intestacy, or if it appeared that there was a prior will to claim a revocation of the former will by the destruction of the second. Just how this constitutes fraud escapes me. In effect, respondents are saying the widow has two bites at the apple, and such a right is eminently unfair. In point of fact, respondents have challenged the execution of the second will on the ground that decedent was incompetent to draw or execute a will in April of 1959.
Since there was in existence a prior will, the subsequent writing of April 1959, could have no effect on the prior will, unless decedent was competent at the time he executed the subsequent will; this being the case whether the will was in existence or destroyed. In short, no intestacy in favor of the widow could exist, unless the earlier will had been revoked by a subsequent valid will. Since the widow concededly had no knowledge of the earlier will, the execution of a subsequent will in her favor gave her nothing, insofar as she was concerned, that she did not already have by virtue of law of intestate succession. It is apparent that as the widow of a childless decedent, she would be entitled to take all of decedent's *392 estate, real and personal. If, under the facts which are undisputed (no one has contended that the widow or the attorney knew of the existence of the earlier will) the widow could gain nothing by the execution of a will in her favor, what would it gain her to destroy such a will? No motive can be found for such destruction except that concerning which she has testified, i.e., destruction in a fit of anger over the relationships existing in the family at the time.
Under these circumstances, it seems to me that the widow has satisfactorily eliminated any suspicions, much more, inferences of fraud which may have been raised by virtue of her act of destruction. Since she has carried this burden, I am of the opinion that the secondary evidence offered in the form of a carbon copy of the will is admissible. I should also observe at this juncture that there is no dispute or, at least, no dispute has been raised concerning the actual contents of the original will which was destroyed. Nevertheless, I am satisfied under the proofs that the carbon copy offered is in fact a carbon copy of the original.

II.
Respondents contend that the will dated April 21, 1959, is invalid because it was procured by the undue influence of decedent's widow and, further because decedent was incompetent to execute a will on the date of execution. With regard to the first ground assigned to invalidity, I am satisfied there is no proof that decedent's widow exercised undue influence upon him to procure the will in question. The evidence adduced going to this issue indicated that any activity by the decedent and his wife with respect to the will was well within the great latitude which is and should be given to a wife in counseling and persuading her husband with respect to the making of a will. See In re Raynolds, 132 N.J. Eq. 141, 153 (Prerog. 1942), affirmed on opinion 133 N.J. Eq. 314 (E. & A. 1943).

*393 III.
The principal force of respondents' argument with respect to the competency of decedent to make or execute his will stems from the existence of the various cerebral involvements which he experienced during the period 1952 until the time of his death. Their testimony sought to show that each cerebral episode left decedent in an increasingly weakened mental and physical condition, and that by the year 1958, he had become incompetent and incapable of exercising any control over his own affairs. They sought to show that decedent had become, prior to the time of the execution of his will, an ill hulk of humanity who was incapable of communicating with anyone. On the other hand, portions of their testimony indicate that decedent went on walks alone, visited the library and visited them at their homes on various occasions. There is no question but that the cerebral episodes had left their marks upon decedent. Certainly, he was not the vigorous, athletic male he had been prior to the onset of his difficulties. To my judgment, this fact answers much of the testimony which tended to show that decedent was not the person he had been after his strokes. Certainly, when we are dealing with an individual of the character, strength and intelligence such as decedent was prior to 1952, deterioration of the sort usually following cerebral involvement will be much more noticeable to those who knew him, since changes were bound to be more dramatic. I am not satisfied, however, that the changes testified to place decedent in such a condition that he was incapable of comprehending or executing a will.
Two medical witnesses were called on behalf of respondents. One of them, Dr. Feldman, an internist and allergist, stated that he knew decedent all of his life and had been decedent's family physician following his first stroke in 1952. He concluded that decedent lacked testamentary capacity in 1959, although it was apparent from the testimony that he had not treated decedent since 1957. There was introduced into evidence a letter addressed by the doctor to the widow in which *394 the doctor indicated he was going to withdraw from the case because his services were not being employed other than to act as a laboratory advisor with respect to medication. This, the doctor believed was unfair to him. I do not accept Dr. Feldman's evaluation of decedent's mental capacity.
The other medical expert was a Doctor Frank Burstein, an ophthalmologist. He knew decedent, he stated, fifty years. He treated decedent twice professionally, in 1955 and 1957. He termed the decedent to have been an absolute vegetable in 1957; yet, he prescribed glasses for the vegetable for psychological reasons. I find the doctor's testimony to be completely without credibility.
As a general principle, the law requires only a very low degree of mental capacity for one executing a will. Clifton v. Clifton, 47 N.J. Eq. 227 (Prerog. 1890); Loveridge v. Brown, 98 N.J. Eq. 381, 387 (E. & A. 1925); In re Wilson's Will, 107 N.J. Eq. 604, 606 (Prerog. 1931), affirmed on opinion 110 N.J. Eq. 68 (E. & A. 1932). Our courts have, on many occasions, indicated that the capacity required in making a will is limited to the testator's comprehending the property he possesses and which is subject to disposition, the natural objects of his bounty, the meaning of the act which he is performing, the relation of all of these factors each to the other, and to the distribution to be made under the will. As it was said in Clifton v. Clifton, supra, by Chancellor McGill, the amount of mental capacity must be equal only to the subject with which it has to deal. Thus, our courts have held that the memory of the testator may be imperfect or impaired by age or disease; that the testator may not be able to recall the names, the persons, or the families of those with whom he has been intimately acquainted, or that he may at times do childish things; that he may speak disjointedly, going from one subject to another, asking idle questions and repeating those which have been asked and answered; yet, under all of these circumstances, he may possess capacity to make a will.
*395 The burden of proving incapacity is upon those who assert it, and the burden has been stated to be one requiring clear and convincing evidence. In re Hoover, 21 N.J. Super. 323, 325 (App. Div. 1952).
In this action the testimony adduced on behalf of the widow quite clearly indicates that the testator prior and subsequent to the date of the execution of this will had much more capacity than that required by the law to execute a will. I do not believe it is necessary to review all of the testimony adduced on her behalf since it is my belief that the testimony adduced on behalf of respondents was insufficient. However, in the interest of setting forth the matters which lead to my conclusion in this case as fully as possible, I mention briefly the following. In January of 1959, decedent visited Dr. Samuels for physical therapy and carried on an intelligent conversation with him. Dr. Samuels testified at the hearing. In February of 1959, decedent conferred with Rabbi Kose, the Rabbi who had married him, in decedent's home. The decedent discussed his property and his sisters with the Rabbi who found him to be intelligible, coherent and lucid. During the spring of 1959, a niece of decedent's widow, whom I found to be completely credible, testified that the decedent had attended a wedding at which he had danced with her and had carried on a completely intelligible conversation. She also testified that she had talked to the decedent on many occasions during 1959 and subsequent thereto, during which they had discussed places and books and personal affairs. She found the decedent's speech to be slow and hesitant, and stated that the decedent had on occasion told her that he had difficulty at times expressing himself. In April of 1959, Miss Jennie Precker, the scrivener of the will, conversed with decedent with respect to the will and found him to be lucid and understandable. In June of 1959, two witnesses, a Mr. Klein and Dr. Reznikoff, the latter a psychiatrist, saw decedent at a social function and both stated that they found him to be intelligent, coherent and understandable. Many of the witnesses to the incidents just referred to were without interest *396 in the case and had no relationship to decedent or his widow. Most significantly, the periods of decedent's life to which all of this testimony referred was that directly preceding and following the date of the execution of his will in April of 1959. This testimony together with the naturalness of the will drawn by decedent bespeaks of competency rather than incompetency.
It is, accordingly, my conclusion that the will dated April 21, 1959, executed by Nathan N. Rasnick, now deceased, was validly executed by him and, therefore, constitutes his last will. Since I am satisfied that the original of this document has been destroyed, I will admit the carbon copy marked P2 for identification in this cause to probate.

IV.
In determining that the copy of the will dated April 21, 1959, should be admitted to probate, I am satisfied that the act of tearing the original thereof by the widow did not constitute a revocation of the will. It is elementary that in our law revocation of a will is accomplished by burning, tearing or obliterating the writing with a concurrent intent to revoke, by the testator, or at his direction. Cf. N.J.S. 3A:3-3. While there was a tearing of the document here, there is no evidence from which any reasonable inference can be drawn that testator intended at that time to revoke the document. See Frothingham's Case, 76 N.J. Eq. 331 (E. & A. 1909); Heise v. Earle, 134 N.J. Eq. 393 (E. & A. 1943); cf. Mills v. Millward, 15 P.D. 20 (1890); Gill v. Gill, English Reports (Prob. Div. 1909), 157.