ARTHUR R. LOVERIDGE, appellant,

*v.*

ALFRED S. BROWN et al., executors, &c., respondents.

[Decided May 18th, 1925.]

On appeal from the prerogative court.

*Mr. Nathaniel Kent,* for the appellant.

*Mr. Edward S. Atwater, Jr.,* for the respondents.

Per Curiam.

On the 5th day of September, 1922, Elizabeth Lees, then a resident of the county of Essex, departed this life, leaving a last will and testament, the validity of which was challenged by her nephew, Arthur R. Loveridge, the present appellant. The matter having been brought on for hearing before the orphans court of that county, it was there held, after a consideration of the proofs, that the will was valid, and a decree was entered admitting it to probate.

The contestant, Loveridge, then appealed to the prerogative court for a review of this decree, and that court, after hearing the arguments of the counsel of the respective parties and considering the proofs submitted in the cause, affirmed the decree of the orphans court upon the grounds set out in the opinion of that court, delivered by Judge Flannagan. Thereupon the present appeal was taken to review the decree of affirmance entered in the latter court.

Our examination of the case satisfies us of the soundness of the conclusion reached both by the orphans court and the prerogative court, and we affirm the decree under review on the opinion of Judge Flannagan, which is as follows:

"This is an appeal from an order of the surrogate of Essex county, made on the 28th day of September, 1922, admitting to probate a certain paper-writing made on the 16th day of March, 1921, as the last will and testament of Elizabeth L. Lees, who died a resident of Essex county, on September 5th, 1922, leaving her surviving as her nearest kin, a sister, Harriet Loveridge, and numerous nephews and nieces.

"In 1910 Mrs. Lees was residing with her husband at the Hotel Beresford, in New York City. Her husband was ill, and one Miranda Hough was engaged as his nurse, and continued in that capacity until April, 1912, when Mr. Lees died. Miss Hough remained with Mrs. Lees until some time in the fall, and then took other work, and was away for about a year and a half.

"Early in 1914, at the request of Mrs. Lees, Miss Hough returned to live with her, and continued to live with her until

her death. Miss Hough owned a cottage in East Orange, and during the years 1917, 1918 and 1919 Mrs. Lees and herself occupied that house as a summer residence. Early in 1920, Mrs. Lees, becoming dissatisfied with her residence at the Hotel Beresford, arranged with Miss Hough to break up their home there and to occupy the latter's cottage in East Orange. Shortly thereafter they decided to build, as a joint enterprise, a home more suited to Mrs. Lees' financial circumstances. Miss Hough thereupon purchased a lot at 19 Whitman avenue to which she took title in her name, whereupon the dwelling, which they called Rainbow Cottage, was built. Into this property Miss Hough put a total amount of $12,000 and Mrs. Lees $18,000. They continued to live at this residence until Mrs. Lees' death.

"At the time when Miss Hough went to live with Mrs. Lees, in 1914, at New York, the arrangements between them were that she was to receive $18 per week, which was later increased to $125 per month, and so continued until 1920. Miss Hough did all the household work, with the exception of engaging an assistant occasionally, and attended to Mrs. Lees, did her dressmaking, acted as her nurse, performed in course of her duties as such a somewhat unpleasant duty made necessary by Mrs. Lees' ailments, and, in general, acted as her companion, nurse and housekeeper.

"On July 2d, 1920, Mrs. Harvie, one of Mrs. Lees' nieces, went to Dr. Swift, a New York physician, who had been attending Mrs. Lees while she resided in New York, and obtained from him a certificate stating that he had formed the opinion that Mrs. Lees was suffering from senile changes, which had affected her mentality and rendered her incapable of sound judgment or discretion. In the latter part of 1920, Mrs. Lees learned of the existence of this certificate, or, rather, that somebody had suggested the appointment of a guardian for her, and was very much concerned about it. She went to her counsel, Mr. Alfred S. Brown, to ascertain if Miss Hough could be appointed. Upon learning that she could not appoint a guardian for herself, Mrs. Lees suggested that she

adopt Miss Hough, and Mr. Brown informed her that for this she must go to a New Jersey lawyer.

"Later, Mrs. Lees, accompanied by Miss Hough, called upon Thomas A. Davis, Esq., a member of the bar of Essex county, who informed her that the statute provided for the adoption of minors only, and an agreement was then prepared, reciting that it was Mrs. Lees' intention to regard Miss Hough in all things as her daughter. Mr. Davis testified that Mrs. Lees conducted the conversation and appeared entirely rational. Later proceedings were brought in the Essex county circuit court whereby Miss Hough, with Mrs. Lees' consent, had her named changed to Miranda Hough Lees.

"The appellants' grounds for appeals are:

"(1) That the will was not executed according to law;

"(2) That Mrs. Lees lacked testamentary capacity, and

"(3) That the will was the product of undue influence exercised upon Mrs. Lee by Alfred S. Brown, Robert S. Hough, James Harvie and Miranda Hough, Benjamin Epstein and Edward B. Taylor.

"The testimony of the witnesses to the will made it so clear that the will was executed in the manner and form prescribed by law that this ground of appeal was not pressed.

"Appellants, however, strenuously insist that Mrs. Lees was mentally incompetent to make a will; that she was an old woman, broken in health and mind, and unable to conduct a conversation intelligently. Voluminous testimony was introduced concerning Mrs. Lees' mental and physical condition, to the effect that at the time of the execution of the will she was a woman of about eighty years old; that she had difficulty in walking and was unable to carry on extended conversations, or, in fact, any conversation; that she would frequently doze off and had to be aroused. Much stress was also laid upon the fact that Dr. Swift had, in 1920, as already seen, issued a certificate to the effect that she was incompetent to care for herself and her affairs; that at the time when her new home, known as Rainbow Cottage, was constructed, Mrs. Lees had erected therein a memorial window to her husband, which was not alone dedicated to him, but to Miranda

Hough Lees as well, and it was insisted that the construction of such a window in her home, dedicated in such manner and rather than in a church, was evidence tending to show incompetency. There was also evidence concerning the construction of an unusually heavy wire fence, set in a concrete base, around a chicken coop in the rear of her dwelling. There was also testimony that she suffered from chronic Bright's disease, inability to control her organs, colds, heart trouble, high blood pressure, rheumatism, swelling of the hands and limbs, and inability to walk except by dragging or shuffling her feet along the floor.

"Many witnesses testified that, in their opinion, Mrs. Lees was not competent, and, as has already been said, much stress was laid upon the certificate of Dr. Swift. The deposition of Dr. Swift was taken and is in evidence. He states that he is a practicing physician in the State of New York; that the last time he saw Mrs. Lees was on April 22d, 1920, or between two and three months before he gave the certificate as to her incompetency, and about a year before the execution of the will; that he had been treating her from November 29th, 1916, and that he is not an alienist or specialist in mental diseases; that during the year prior to July, 1920, the date of the certificate, he had seen her eight times, and that he never made any special examination of Mrs. Lees for the purpose of making the certificate. The depositions give no facts upon which the doctor based his opinion.

"It is well settled that the abstract opinion of any witness, medical or of any other profession, upon the question of the testamentary capacity of a testator, is of no importance, and that no judicial tribunal would be justified in deciding against the capacity of a testator upon the mere opinion of witnesses, however numerous or respectable. The opinion of a witness must be brought to the test of facts, that the court may judge to what weight the opinion is entitled. *Stackhouse* v. *Horton, 15 N. J. Eq. 202, 208; Waddington* v. *Buzby, 45 N. J. Eq. 173,* and cases cited (at *p. 174*); *Clifton* v. *Clifton, 47 N. J. Eq. 227.*

"The opinion of Dr. Swift is therefore entitled to no weight, it being supported by no facts whatever. So far as the opinions of the various witnesses as to testatrix's mental capacity is concerned, these opinions are founded upon facts so trifling that they are entitled to little weight. They merely presented a picture common among the aged and familiar to all who have come in contact with them.

"On the part of the proponents it was shown that Mrs. Lees impediment in walking came about by reason of a fall which she had some years previous, and that for awhile she had to walk with a cane, and that she never recovered the complete use of her foot, but that it dragged when she walked. That she was able to get about without much difficulty, however, is evidenced by the undisputed fact that up to within a month or so of the date of her death she attended services at a church in New York every Sunday except in the summer months, when the church was closed, and that then she attended a local church, and this irrespective of the character of the weather. It is also undisputed that she made many trips to New York in connection with her business affairs; that she always went to her safe deposit box in the company of either Mrs. Harvie or Miss Hough for the purpose of cutting coupons on her bonds when they became due; that on these occasions she, herself, prepared the envelopes for depositing the coupons, although the coupons themselves were actually cut off by her attendant and handed to her and she placed them in envelopes, and that this continued until a month or so prior to her death and for a year after the executing of the will. It is also undisputed that she had numerous afternoon teas at her home, to which many of her friends were invited. This continued, at least, until the spring after the execution of her will. Mrs. Lees was a voluminous letter-writer, and an inspection of her correspondence, a great mass of which was introduced in evidence, indicates that she was an intelligent, cultured woman.

"Where it is shown that a testator was able to transact business with sagacity and decision, his testamentary capacity will be established. *Whitenack* v. *Stryker*, *2 N. J. Eq. 8;*

*Hunt* v. *Hunt, 13 N. J. Eq. 161; Yauger* v. *Skinner, 14 N. J. Eq. 389.* As late as March 3d, 1922, a year after the execution of the will, testatrix addressed a letter to John Augustus Lees, a brother of her husband and manager of the Lees Manufacturing Company, which her husband had founded and in which she had a large interest, complaining of the fact that she had received no dividends from the business for some time; that her income had been seriously diminished and that she felt that she must sell her interest in the business and invest the money received from the stock in an annuity. She goes on in her letter to explain that this is a great sorrow to her, because she knew she would have to sell at a sacrifice; that she did not wish the stock to go outside of the family, and was therefore willing to let him have it at a low figure, in order to keep it in the family; that she was sure her husband would have liked her to do that. It is also in evidence that she made frequent business calls at the office of the Lees Manufacturing Company in New York, and had consultations there with one Benjamin Epstein, whom she had frequently consulted in regard to her business affairs, and who testified that he prepared statements of the business for her, which she examined carefully and complained bitterly, because of the fact that the business was paying her no dividends. It is also in evidence that she consulted certain brokers from time to time in regard to her investments.

" 'The standard of testamentary capacity has been fixed at a very low point in the scale of intelligence. The right of a testator, however feeble his powers of mind or body, to the control of his property by testamentary disposition, so long as he has intelligence to exert it, has been, by the courts of this state, at least, inflexibly maintained.' *In re Shimer's Will, 103 Atl. Rep. 383,* and cases therein cited. Measured by the standard laid down in this case, there can be no doubt that Mrs. Lees was possessed of testamentary capacity. It is also contended by appellants that the will is the product of influence exercised by or the result of a conspiracy entered into between Alfred S. Brown, Robert S. Hough, James Harvie, Miranda Hough, Benjamin Epstein and Edward B. Tay-

lor. In support of this contention it is urged that about 1920 Miranda Hough took complete charge of the house and also of Mrs. Lees' finances; that she sold a large number of bonds and deposited the proceeds in her name, and from that time on completely dominated the household, and that it was during this complete domination period that the various papers were executed and the will was drawn and signed; that she accompanied Mrs. Lees to the office of Mr. Brown and remained in the room during the entire period, so that nothing could escape her.

"First, in regard to the sale of the bonds, the testimony is that, in order to raise the money with which to construct Rainbow Cottage, Mrs. Lees directed Miss Hough to sell certain of her Liberty bonds, which she did. Miss Hough frankly states that she placed the proceeds in the bank, in her own name, and used it for the purpose designated, which testimony stands unimpeached. Miss Hough says that from the time of the so-called adoption agreement they lived together as mother and daughter; that she, at Mrs. Lees' request, addressed her as 'mother.' There is also in evidence letters from Mrs. Lees to certain of her friends, announcing the fact of the so-called adoption, and requesting them to accord Miss Hough the greatest consideration. There is also in evidence a formal engraved card announcing the supposed adoption, and that Miss Hough would thereafter take the name of Miranda Hough Lees which was mailed to their friends.

"That confidential relations existed between Miss Hough and Mrs. Lees cannot be doubted, but it would seem that these relations were more similar to those existing between mother and daughter. Mrs. Lees was alone in the world, and for some six or seven years Miss Hough had been her only companion, and, according to the universal testimony, had served her well and faithfully, and it was but natural that an affection should spring up between them.

"The existence of confidential relations between the testator and the favored beneficiary, standing alone, does not necessarily constitute undue influence. It is but natural that a person, when disposing of his property in anticipation of his

decease, should give it to those who show him kindness and manifest love and devotion toward him. *In re Eatley's Will, 82 N. J. Eq. 591.* And the mere fact that the sole beneficiary of the will was the confidential companion and business adviser of the testator for several years prior to his death, is not, of itself, evidence of undue influence. *Wheeler* v. *Whipple, 44 N. J. Eq. 141.* And in this connection it must be remembered that Miss Hough, or Lees, as she should be called, is not the sole beneficiary under the will of Mrs. Lees. Estimates of the proportion of the estate which she will receive under this will vary from fourteen per cent. on the part of proponents to thirty per cent. on the part of appellants, the difference being accounted for by different valuations of the securities of the estate and other questions which need not be entered into here.

"The influence which the law denominates 'undue' must be such as to destroy the free agency of the testator and amount to moral or physical coercion. It must be proved, moreover, that the act done was the result of such coercion. There must be a control exercised over the mind of the testator or an importunity practiced which he could not resist. *Clifton* v. *Clifton, supra; In re Tunson's Will, 83 N. J. Eq. 277.* The will now under attack was executed under the following circumstances. Testatrix had executed several wills theretofore, and on February 14th, 1921, wrote to her attorney, Mr. Brown, in her own hand, to the following effect:

" 'Circumstances have arisen involving Mr. Philip Haffner, which makes it imperative for me to change my will so decidedly that I have decided to make a new one, and I am writing to ask you to notify me of some day next week that promises to give you sufficient leisure to accord me an interview with you for that purpose.'

"Later on Mrs. Lees sent to her attorney, Mr. Brown, written instructions, in her own handwriting, in regard to the changes she desired in the will. These instructions referred to a previous will, which he had prepared for her, and she had executed, and which instructions could be identified by the paragraph in that will which he had in his possession. The

written instructions above referred to were received in evidence and were as follows:

"1st. F. Philip Haffner to be excluded from my will for reasons I will inform Mr. Brown orally. In his place, as executor with Mr. Brown, I want Dr. Robert H. Hough, 3136 Broadway, New York, to take his place.

"8. Miranda Hough Lees, now my adopted daughter, instead of F. Philip Haffner.

"11. Mrs. Philip Haffner to receive direct $10,000, and to do exactly as directed to do. Incorporate in this will what my codicil directs in connection with Mrs. Haffner's two boys.

"12. I give and bequeath to Miranda Hough Lee, my adopted daughter, what I have designated in paragraph 12.

"17. Omit.

"18. Omit.

"19. Omit.

"20. Omit.

"21. (*Not to be omitted.*)

"22. Omit.

"23. Omit

"24. Omit.

"25. Omit.

"On March 8th, 1921, Mr. Brown received the following letter from Mrs. Lees, in her handwriting, which was received in evidence.

"'Tuesday, at 19 Whitman avenue, East Orange, New Jersey. Dear Mr. Brown: In accordance with dear Mrs. Harvie's wish I have decided to ask you to add Mr. Harvie's name in connection with yours and Dr. Hough's, concerning which I would be very pleased to have you write him, also Dr. Hough, if you have not already done so. I also trust it will be perfectly convenient to you to have me sign my will before next week is in the past.'

"Mr. Brown testified that at the execution of the will, on March 16th, 1921, Mrs. Lees, accompanied by Miss Lees, called at his office, on which occasion Mrs. Lees talked about the reasons for making the changes which she did make. She talked about certain difficulties that had arisen between

her niece Marion, who had married Mr. Haffner, and Mr. Haffner. She said that there had been a disagreement between them and they had separated, and she spoke very decidedly about Mr. Haffner's conduct towards her niece Marion, and she said she wanted to eliminate him from her will both as executor and as trustee for Marion, and also as a legatee, those provisions Mr. Haffner enjoyed in the previous will. The will, which was in exact accord with Mrs. Lees' written instructions, was thereupon duly executed under the superintendence of Mr. Brown, the witnesses being Joseph Frankenthal, Franklin S. Morrell and Homer H. Pennock.

"While the existence of confidential relations between the testator and the favorite beneficiary, standing alone, does not, necessarily, constitute undue inffuence, yet when such relations are supplemented by other *indicia* of undue influence, such as the exclusion from testator of the natural objects of his bounty, clandestinity in the execution of the will, or the active participation of the favorite legatee in procuring its execution, a presumption of undue influence may arise. *Spark's Case, 63 N. J. Eq. 242.*

"In the case under consideration there certainly was no exclusion from the testatrix of the natural objects of her bounty. With the exception of the one or two of her numerous nephews and nieces, she either visited, or was visited, constantly by all of them. Clandestinity in the execution of the will was not shown. In fact, Mrs. Lees wrote to Mrs. Harvie an exact account of what disposition she had made in her favor. The presence of Miss Lees at the execution of the will is not an active participation in procuring the will such as is spoken of in the cases. As a matter of fact, she participated in no way in the execution of the will. As has been shown, the direction as to the changes in the will were received by Mr. Brown in the testator's handwriting, and in this connection it is significant that the instructions for preparation of the will did not change the provisions for Miss Lees from those in the previous will of August, 1920.

"The burden of proving undue influence is upon him who asserts it. It has, however, been held that where confidential

relations are shown, and any of the *indicia* of undue influence before mentioned, or other slight circumstances exist, that the burden of proof is shifted. It does not appear that even the slight circumstances above mentioned as sufficient to shift the burden of proof exist. But, assuming that they do exist, and the burden of proof has shifted, and that it is the duty of Miss Lees to prove affirmatively that she did not influence the testatrix, we are met with her frank testimony that she did not influence, or attempt to influence, Mrs. Lees in the execution of her will, and that she took no interest in what disposition Mrs. Lees made of her property beyond such as was necessary to secure to her the money which she had tied up in the Rainbow Cottage, which represented all she had in the world. Where the burden is cast upon the proponents of a will to show that undue influence has not been exerted, such burden will, as a general rule, be sustained by a general denial of undue influence if otherwise credible and not challenged by other facts. *In re Eatley's Will, supra.*

"In the case under consideration we have that general denial, and the denial is entirely credible. The testimony does not establish a single incident where Miss Lees attempted to impose her will upon the testatrix in the management of her business affairs. As to the charges of conspiracy they are entirely without foundation of fact.

"The will should be admitted to probate."

*For affirmance*—THE CHIEF-JUSTICE, TRENCHARD, PARKER, MINTURN, BLACK, KATZENBACH, CAMPBELL, LLOYD, WHITE, GARDNER, VAN BUSKIRK, CLARK, McGLENNON, KAYS, JJ. 14.

*For reversal*—None.