21 N.J. Super. 323 (1952)
91 A.2d 155
IN THE MATTER OF THE ESTATE OF LEWIS C. HOOVER, DECEASED.
LEWIS VOLLMER HOOVER, PROPONENT-APPELLANT, AND AMELIA HOOVER AND JOAN VENINO MORTON, CAVEATRICES-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued July 7, 1952.
Decided September 9, 1952.
*324 Before Judges JAYNE, COLIE and GRIMSHAW.
Mr. Thomas J. Smith argued the cause for the proponent-appellant Lewis Vollmer Hoover (Messrs. Parsons, Labrecque, Canzona & Combs, attorneys; Messrs. Birdsall & Madigan, of counsel).
*325 Mr. Robert V. Carton argued the cause for the caveatrices-respondents Amelia Hoover and Joan Venino Morton (Messrs. Durand, Ivins & Carton, attorneys).
The opinion of the court was delivered by GRIMSHAW, J.S.C.
This is an appeal from an order of the Monmouth County Court denying probate to a will of Lewis C. Hoover, dated July 31, 1950, and admitting to probate an earlier will dated December 22, 1949. So far as the admission to probate of the will of December 22, 1949, is concerned, the record fails to provide justification for the court's action. The petition for probate and order to show cause thereon which initiated these proceedings had reference solely to the will of July 31. No intimation was given to any of the parties that the earlier will would be offered for probate and the parties had no opportunity to attack it. However, in view of the conclusion at which we have arrived, no further consideration need be given to that point.
The will, probate of which was denied, was executed with all of the formalities which the statute requires. At the time of its execution the testator was able to comprehend the extent of his property and to appreciate the nature of the transaction upon which he was engaged. But the validity of the will was questioned upon the ground that because of an insane delusion concerning his wife's fidelity, Hoover was unable to comprehend her as a natural object of his bounty. Such was the conclusion of the county judge.
The presumption of law is in favor of testamentary capacity. And the burden of establishing a lack of testamentary capacity is upon the one who challenges its existence. That burden must be sustained by clear and convincing evidence. A will may be contrary to the principles of justice and humanity; its provisions may be shockingly unnatural and extremely unfair, nevertheless if it appears to have been made by a person of sufficient age to be competent to make a will and also to be the free and unconstrained product of a sound mind, the courts are bound to uphold it. Middleditch *326 v. Williams, 45 N.J. Eq. 726 (Prerog. 1889), reversed on other grounds, 47 N.J. Eq. 585 (E. & A. 1890); Smith v. Smith, 48 N.J. Eq. 566 (Ch. 1891); In re Triebe, 114 N.J. Eq. 227 (E. & A. 1933).
Both Hoover and his wife had been previously married. Hoover had one son by a prior marriage, the appellant Lewis V. Hoover. Mrs. Hoover had several children and grandchildren, of whom the respondent Joan Venino Morton was one. The married life of the Hoovers was stormy and marked by frequent and violent quarrels. Hoover is pictured as a stubborn, selfish and vulgar old man, given to violent outbursts of temper. He was concerned solely with his own comfort and was determined to get it at all costs. On several occasions Mrs. Hoover left the home. Her last departure was shortly before the execution of the will of July 31, 1950. Hoover died without seeing her again.
The claim that Hoover was suffering from an insane delusion was based largely on testimony given by Mrs. Hoover. That testimony dealt with two occasions in 1949 when Mrs. Hoover left the home, once to visit her children and once to go on a shopping expedition. She testified that on each occasion Hoover followed her to the bus station and accused her of seeking to keep a rendezvous with another man. There was also testimony by an acquaintance that on one occasion Hoover made a remark of similar tenor to her. From the testimony concerning the statements and the circumstances under which they were made, we are left with the impression that they were the result of venom rather than belief in their truth. And they are not proof that Hoover was suffering from an insane delusion. Smith v. Smith, supra; Middleditch v. Williams, supra; In re Thomson, 4 N.J. Super. 150, 155 (App. Div. 1949).
Following one quarrel in November of 1949, Hoover executed a will disinheriting his wife. Then in December of that year he had a change of heart. On the eve of his release from a hospital after undergoing a serious operation he destroyed the November will and executed the will of *327 December 22, 1949. That will was admitted to probate by the County Court. In this latter will the testator's residuary estate was divided equally between Lewis V. Hoover, Amelia Hoover and Joan Venino Morton.
On July 29, 1950, after a period of calm, there was another quarrel between the Hoovers, in which Joan Morton and her mother participated. It became so violent that Mrs. Hoover removed all her belongings and left the house. The account of this final quarrel and the reasons for it differ, but there was no suggestion that it was occasioned by suspicions entertained by Hoover concerning his wife's faithfulness.
After his wife's departure Hoover asked a friend to arrange an appointment with his lawyer for the purpose of having a new will prepared. The appointment was made and on the morning of July 31, 1950 Hoover was taken to his attorney's office. There the details of the new will were discussed. After providing for several charitable bequests Hoover directed that the residue of the estate should go to his son, Lewis V. Hoover. The testator insisted on dictating the sixth paragraph of the will himself. That paragraph reads as follows:
"SIXTH: I do not want my wife, Amelia Hoover, to share in my estate to the value of anything beyond what she is entitled to under the law."
While the will was being dictated, Hoover inquired concerning the disposition of his property in the event of his son's predeceasing him. That led to the preparation of the codicil. When both will and codicil had been dictated, Hoover left. In the afternoon Mr. Birdsall, the attorney, and his secretary, went to the Hoover home. Hoover took the document and retired to his room. After an interval of approximately fifteen minutes, Hoover called in the witnesses and executed the will and codicil. A few days later he died.
*328 All of the witnesses to the preparation and execution of the will were positive in stating that at no time during that period did Hoover exhibit any sign of mental disturbance or excitement. His behavior appeared to be perfectly normal.
Several physicians were called by the respondent. They testified that as a result of cerebral arteriosclerosis, a condition resulting from age, Hoover was becoming senile. They all agreed, however, that as a general thing his mind was lucid except when he was in the grip of one of his rages, and none of them ventured the opinion that he was lacking in mental capacity.
An appellate court is always loath to interfere with findings of fact made by a trial judge who has had the opportunity to see the witnesses and view their demeanor on the stand. However, after a study of the record, we are of the opinion that the evidence fails to support the conclusion that at the time of the execution of the will of July 31, 1950, Hoover was suffering from an insane delusion which rendered him incapable of making a valid will. Rule 1:2-20(a); Rule 4:2-6. In our opinion the will of July 31, 1950 was valid and should have been admitted to probate.
The judgment of the Monmouth County Court is reversed and the record remanded for further proceedings in accordance with the views expressed herein.