**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3475-21

IN THE MATTER OF
THE ESTATE OF
DAVID K.T. CHAO,
deceased.

_____

Argued September 14, 2023 – Decided February 27, 2024

Before Judges Vernoia, Gummer and Walcott-Henderson.

On appeal from the Superior Court of New Jersey, Chancery Division, Morris County, Docket No. P-002776-18.

Robert P. Zoller argued the cause for appellant Daniel Chao (Eckert Seamans Cherin & Mellott, LLC, attorneys; Robert P. Zoller and Emma M. Lombard, on the briefs).

Adam Paul Dubeck argued the cause for respondent Christopher Chao (Dubeck & Miller, attorneys; Adam Paul Dubeck, on the brief).

PER CURIAM

Daniel T. Chao (Daniel) appeals from the Probate Part's May 31, 2022 order admitting the January 17, 2018 will of his father, David K.T. Chao

(decedent), to probate and dismissing Daniel's complaint alleging undue influence by his brother, respondent Christopher D. Chao (Christopher), and that decedent lacked the requisite testamentary competency to execute the will.[1] We affirm in part, vacate in part, and remand for further proceedings.

I.

Decedent passed away at age ninety-two on November 21, 2018. He was survived by his wife, Irene, and three sons, Christopher, Daniel, and Mark D. Chao (Mark). Weeks following his death, decedent's January 17, 2018 will was admitted to probate. The will designates Christopher as executor, provides for Irene to receive the minimum statutory share, and bequeaths the residuary estate in equal shares to Christopher and Mark. The January 17, 2018 will revoked decedent's 2015 will that had designated Daniel as executor, granted Irene the minimum statutory share, and bequeathed the residuary estate in equal shares to Daniel, Christopher, and Mark. In short, Daniel received nothing under decedent's January 17, 2018 will.

---

[1] Because the parties and their family members share the same surname, we refer to them by their first names for purposes of clarity and convenience. We intend no disrespect by doing so.

A-3475-21

Daniel filed a verified complaint challenging the admission of the will to probate, claiming decedent lacked the testamentary capacity to execute the January 17, 2018 will and the will was the product of undue influence by Christopher. Daniel also challenged Christopher's administration of decedent's estate as the appointed executor under the will.

The court later denied Christopher's motion for summary judgment on Daniel's claims but granted Christopher's request for bifurcation of the trial. The court ordered that it would first conduct a trial on the issues pertaining to the validity of the January 17, 2018 will and then, "if needed," conduct a trial on the claims concerning Christopher's actions as executor in administering the estate.

The evidence at the trial on Daniel's challenge to the admission of the will to probate established that in 2013, decedent contacted Daniel, who was then living in China, and requested that Daniel return to the Parsippany home decedent shared with Irene and their youngest son, Mark. Decedent sought Daniel's assistance in providing care for Irene, who suffered from dementia, and Mark, who is developmentally disabled. Within one week, Daniel returned to the United States and moved into decedent's home, where Daniel thereafter provided care to Irene and Mark.

A-3475-21

According to Daniel, beginning in 2016, decedent "was becoming forgetful" and began asking "what date is it?" and "what month is it?" Daniel testified that later in 2016, decedent had begun to "get[] physically violent" with him, Irene, and Mark. Daniel explained there was a gradual increase in the frequency and violence of decedent's actions against his family members over the course of 2017 and into 2018. Daniel video recorded at least three incidents during which decedent had used physical force against Irene and Mark.

On January 16, 2018, the day prior to decedent's execution of the contested will, Daniel filed a domestic-violence complaint and application for a temporary restraining order (TRO) against decedent based on claims decedent had committed acts of domestic violence against eighty-four-year-old Irene and Mark. Daniel alleged it was a "regular occurrence" for defendant to strike and verbally abuse Irene and Mark. Daniel further alleged decedent "often attack[ed] him while he [tried] to protect his mother and brother." Daniel also averred that there were pending criminal complaints against decedent arising out of his conduct. The court did not enter the requested TRO on January 16, 2018, the day Daniel filed the domestic-violence complaint.

Christopher lived in New York in January 2018. He testified that on January 16, 2018, he contacted the law firm of Dubeck & Miller after he and

decedent were notified that a TRO was going to be entered the following day against decedent and that, as a result, decedent was "going to be thrown out of [his] house." Christopher testified that decedent had sought to speak to an attorney to determine the steps required to remove Daniel from the house and "file a complaint for physical violence against Daniel[.]" Christopher explained decedent also had sought a power of attorney "to protect [decedent] if he was thrown out of the house and [to] take care of whatever" was necessary. Christopher explained that the reasons for making the appointment with the law firm did not include the preparation of a will for decedent.

According to Christopher, at some point during the following morning of January 17, 2018, he picked up decedent at the Parsippany home and drove him to the law office of Dubeck & Miller. While at the law firm, Christopher and decedent first met with attorney Mark D. Miller. They initially discussed with Miller "how to address the domestic violence complaint" Daniel had filed against decedent and about the preparation of a power of attorney for decedent.

During those discussions, Christopher received a phone call on his cellphone from Daniel that Christopher put "on speaker." During the phone call, Daniel said decedent had "to leave the house" and "see the police." The evidence established that at 3:10 p.m. on January 17, 2018, the court entered the domestic-

A-3475-21

violence TRO against decedent that Daniel had requested the prior day. The TRO barred decedent from his home and prohibited decedent from having any contact or communications with Daniel, Irene and Mark.

According to Christopher, following the phone call, decedent said he wanted Daniel "out of his life" and his house. Christopher testified that Daniel's phone call "was the last straw" and generated—for the first time—discussions concerning the preparation of decedent's new will. Miller testified that "when the call [from Daniel] came in," decedent insisted the new will "ha[d] to be done [that] []day." Decedent then had discussions with Miller concerning the preparation of a will. Christopher testified he was unsure if he was present when those discussions took place.

Miller drafted decedent's will that day—January 17, 2018. Decedent's execution of the will was witnessed by Miller and another attorney, Harvey H. Gilbert. Gilbert's paralegal, Ruth Kuhl, notarized decedent's signature.

Miller testified that on January 16, 2018, he was advised by his partner, Adam P. Dubeck, that decedent and Christopher were coming to the law office the following day for preparation of a power of attorney and for "something about a domestic violence complaint." Miller did not have any understanding decedent "was interested in doing a will."

A-3475-21

According to Miller, when he first met with decedent and Christopher on January 17, 2018, "[t]hey wanted" a power of attorney because decedent was going to be removed from his house. Miller testified that he had expected only to prepare the power of attorney until Daniel called Christopher. Miller testified he had overheard the call and, during the call, Daniel said decedent was "outta the house" and that he had booked a hotel room for decedent.

Miller explained decedent was "upset" and "not happy about" the call and "decided that not only did he want to do the [power of attorney,] but he wanted to do a new will." In response to decedent's request, Miller asked decedent if he was "sure [he] want[ed] to do" a new will that day, and, when he asked, "[d]oes it have to be done today?" decedent "said yes."

Miller further testified he was informed by either decedent or Christopher that in decedent's prior will, he had appointed Daniel as executor, provided for Irene to receive the minimum statutory share of the estate, and bequeathed his residuary estate in equal shares to his three sons. Miller also recalled that following Daniel's call and decedent's request for a new will, decedent said "[h]e wanted Daniel out," Irene to get "the statutory minimum[,]" and "the balance of his estate to be split equally between Mark and Christopher," with Christopher to serve as executor.

7

Miller also described decedent's physical condition on January 17, 2018, as "[p]retty good," and he testified decedent "wanted to execute [the will] that day." While Miller prepared the will, decedent and Christopher went to the police station and filed a criminal complaint against Daniel. When decedent and Christopher returned to the law office, Miller reviewed with decedent "the operative provisions of the will[,]" including "who the beneficiaries are, who the executor is, who the backup executor is, [and] how the estate is going to be distributed."[2]

Miller further testified that he had asked decedent whether he "really want[ed] to do this" before decedent executed the will. Miller also recalled that he, Gilbert, and Kuhl asked decedent questions concerning the date, where he was, and who was the president of the United States, and decedent "convinced" them he knew what he was doing and "this was what he wanted to do." Miller explained decedent had mentioned that Daniel was living at decedent's house and not paying rent, driving decedent's car, "destroying the house and punching in the walls," and had physical altercations with decedent. Miller testified he

---

[2] In the will, decedent appointed attorney Dubeck to serve as executor in the event Christopher declined to serve, failed to qualify as executor, or ceased to act as executor.

and Gilbert confirmed with decedent that Daniel would receive nothing under the will, and decedent stated that was what he wanted.

According to Miller, he told decedent he believed there would be a will contest. Miller brought in Gilbert and Kuhl to "make sure in their own minds" decedent was "competent to make the will" and the will reflected "what [decedent] wanted." Miller testified he had asked Gilbert and Kuhl to ask decedent "their own questions" to ensure "they were confident" decedent's decision to make a new will was "not the result of an incompetent person," decedent "had testamentary capacity," and decedent "wasn't being unduly influenced by anybody."

Kuhl testified she was a notary public and worked as a paralegal for Gilbert, whose law practice included the preparation of wills. During her employment by Gilbert, Kuhl had notarized the signatures on over two hundred wills, and she notarized decedent's signature on the January 17, 2018 will.

Kuhl testified she was present when Miller had spoken to decedent about the terms of the will. She explained that Miller had "specifically asked [d]ecedent to . . . verify that he understood he was leaving one of his sons out of the will" and that Gilbert had asked decedent questions concerning whether

decedent "knew what he was doing." She recalled decedent had said he knew what he was doing and he "wanted to take his son out of his will."

Gilbert testified he had practiced law for fifty years, routinely prepared wills for clients, and witnessed decedent's execution of the will at Miller's request. Gilbert explained that on January 17, 2018, Miller had told him that decedent was "disinheriting one of his children," it was probable there would be a will contest, and he wanted Gilbert "to make sure that [decedent] was . . . competent."

Gilbert recalled asking decedent questions prior to the execution of the will and ascertaining decedent was "very clear" he was signing the will and "disinheriting one of his sons." Gilbert further testified decedent "knew what he was doing," "knew where he was and what day it was," and "was on top of what he was doing." Gilbert also witnessed Miller discussing the content of the will with decedent. Gilbert testified that based on his interactions with decedent, he "knew that [decedent] was competent" and he had "[n]o doubts whatsoever" about decedent's competency.

Christopher called Dr. Jagdesh Dang as a witness. Dr. Dang is a psychiatrist who conducted an evaluation of decedent on January 26, 2018, nine days following the execution of the January 17, 2018 will and after decedent's

10

move into an assisted-living facility.[3] Dr. Dang explained he had been requested by Miller's partner, Dubeck, to conduct an evaluation of decedent's "capacity."[4]

Dr. Dang recalled that he had met with decedent alone for "well over an hour" and perhaps as long as one hour and a half and had determined decedent was "competent to manage legal affairs," including execution of a will. Dr. Dang testified decedent had talked about his three children, stated "he was in conflict with one of his . . . sons," and explained "what the problems were and why he was writing the will as he was writing" it. Dr. Dang asked decedent questions to assess his "orientation, memory, attention, concentration, comprehension, recall, illusions, and hallucinations" and, based on his evaluation, "certified [decedent] as competent to handle his medical, legal, and financial affairs."

---

[3] Following his execution of the will on February 17, 2018, decedent stayed with Christopher for five days and was admitted to an assisted living facility on February 22, 2018.

[4] Dr. Dang testified that he did not recall any conversations with Dubeck or anyone from Dubeck's law firm concerning the evaluation or the circumstances that led to Dr. Dang conducting the evaluation. However, in his report, which was admitted in evidence, Dr. Dang states that he was requested to perform "an evaluation of [decedent's] capacity to manage his affairs and need for appointment of a guardian." Dr. Dang acknowledged he was not retained to render a "testamentary capacity report."

In connection with a 2018 guardianship proceeding concerning Irene, Dr. Matthew Barnas, a geriatric psychiatrist, submitted an August 26, 2018 certification stating he was decedent's "treating psychiatrist" and opining decedent was "forgetful, disorientated to location and month with fluctuating episodes of severe confusion with delusions and intense agitation and aggressive behavior" and that decedent's prognosis was "poor."

At trial, the court "accepted" Dr. Barnas "as an expert in the medical field of psychiatry." Dr. Barnas testified he first saw and evaluated decedent in April 2018, three months after execution of the January 17, 2018 will. Dr. Barnas offered his opinion as to the likely progression of decedent's condition and concluded decedent "most likely . . . had the[] same issues, symptoms, impairments in January [2018] that he was exhibiting in April."

Daniel also presented at trial Dr. Michael Robinson, a psychiatrist whose practice "involves the evaluation and treatment of patients with mood disorders, anxiety disorders, [and] schizophrenia" but "include[s] the treatment of people who have what [is] generally refer[red] to as dementia." The court "accepted" Dr. Robinson "as an expert in the field of psychiatry."

Dr. Robinson never examined decedent. Instead, he reviewed the complaint in this matter, Dr. Barnas's records and certification, Dr. Dang's

12

certification, and decedent's medical records from Morristown Memorial Hospital. Dr. Robinson opined decedent suffered from "significant impaired functioning and cognitive status" that he concluded were extant when decedent executed the January 17, 2018 will and did not improve thereafter. According to Dr. Robinson, the fact that Dr. Barnas's reports and examinations post-dated the execution of the will did not affect his opinions because, in his view, "there was clear evidence of dementia and impaired decision making well prior to that."

Daniel presented evidence establishing that decedent had executed a 2015 will that modified a 1994 will, which had appointed Irene as executor and Daniel and Christoper as successor executors. In the 2015 will, decedent bequeathed a spousal elective share to Irene, and the residual estate equally to Daniel, Christopher, and Mark. The will appointed Daniel as executor and decedent's niece as successor executor and trustee. In 2015, decedent also executed a document granting Daniel power of attorney on decedent's behalf.

According to Daniel, decedent eliminated Christopher as a successor executor in the 2015 will because it had been discovered Christopher previously took substantial sums of money from Irene—including $120,000 she had inherited from a relative—without Irene's knowledge or consent. A criminal investigation of Christopher's alleged conversion of the funds resulted in his

13

agreement to repay the monies taken and his execution of a promissory note obligating him to do so. According to Daniel, decedent executed the 2015 will "to ensure that Christopher had no opportunity to take control of anyone's money in the family," including decedent's estate and Mark's trust fund.

In its written statement of reasons following the presentation of evidence, the court made findings of fact based on the evidence presented and its assessment and weighing of the evidence it found credible and persuasive. The court concluded Daniel had failed to sustain his burden of establishing decedent was either subject to undue influence by Christopher or lacked sufficient testamentary capacity to execute the will on January 17, 2018. The court entered an order admitting the will to probate, and this appeal followed.

## II.

"The findings of the trial court on the issues of testamentary capacity and undue influence, though not controlling, are entitled to great weight since the trial court had the opportunity of seeing and hearing the witnesses and forming an opinion as to the credibility of their testimony." Gellert v. Livingston, 5 N.J. 65, 78 (1950). The court's factual findings "should not be disturbed unless they are so manifestly unsupported or inconsistent with the competent, reasonably credible evidence so as to offend the interest of justice." In re Will of Liebl, 260

N.J. Super. 519, 524 (App. Div. 1992). "A trial court's interpretation of the law and the legal consequences that flow from established facts are not entitled to any special deference." Manalapan Realty, L.P. v. Twp. Comm. of Twp. of Manalapan, 140 N.J. 366, 378 (1995). We apply these standards here.

A.

Daniel claims the court erred by finding decedent had sufficient testamentary capacity on January 17, 2018, to execute the will. Daniel contends the court could not correctly find decedent had the requisite testamentary capacity because it otherwise stated in its opinion that it "accept[ed]" the opinions of Drs. Robinson and Barnas, and they had testified decedent lacked the testamentary capacity to sign the will on January 17, 2018. David argues "[t]he only logical conclusion that flows from the trial court's acceptance of [his] medical expert's testimony is the [will] is invalid as a matter of law."

"The point in time at which testamentary capacity is to be tested is that of the execution of the will." Gellert, 5 N.J. at 76. There are legal presumptions "in favor of testamentary capacity," In re Hoover's Est., 21 N.J. Super. 323, 325 (App. Div. 1952), and "that 'the testator was of sound mind and competent when he executed the will,'" Liebl, 260 N.J. Super. at 524 (quoting Haynes v. First Nat'l State Bank of N.J., 87 N.J. 163, 175-76 (1981)).

Generally, "the law requires only a very low degree of mental capacity for one executing a will." In re Will of Rasnick, 77 N.J. Super. 380, 394 (Cnty. Ct. 1962). Testamentary capacity is measured by "'whether the testator can comprehend the property he is about to dispose of; the natural objects of his bounty; the meaning of the business in which he is engaged; the relation of each of the factors to the others, and the distribution that is made by the will.'" Liebl, 260 N.J. Super. at 524 (quoting Gellert, 5 N.J. at 73). Thus, even where "[a] will may be contrary to the principles of justice and humanity [and] its provisions may be shockingly unnatural and extremely unfair," a court is "bound to uphold it" as long as "it appears to have been made by a person of sufficient age to be competent to make a will and also to be the free and unconstrained product of a sound mind[.]" Hoover's Est., 21 N.J. Super. at 325.

"[T]he burden of establishing a lack of testamentary capacity is upon the one who challenges its existence." Ibid. As the trial court correctly recognized, "[t]hat burden must be sustained by clear and convincing evidence." Ibid.

The court made detailed findings supporting its determinations decedent had the requisite testamentary capacity to execute the will, Daniel had failed to present clear and convincing evidence sufficient to overcome the presumption that decedent had the requisite testamentary capacity, and Christopher otherwise

16

had presented persuasive evidence decedent possessed requisite capacity when he executed the will.

The court found credible and persuasive the testimony of attorneys Miller and Gilbert, and notary public Kuhl, concerning decedent's appearance, words, and actions on the day he decided he wanted a new will, asked for the will to be prepared, and executed the will in response to Daniel's decision to obtain a TRO that ousted decedent from his home and prevented him from returning. The court also found persuasive the testimony of Dr. Dang, who had evaluated decedent nine days after the will's execution to determine defendant's capacity to govern his personal and legal affairs, and who had opined decedent possessed that capacity at that time. In sum, the court's determination decedent possessed the requisite testamentary capacity is supported by substantial credible evidence, and we therefore discern no basis to reverse its conclusion. See Liebl, 260 N.J. Super at 523.

We reject Daniel's contention we must reverse the court's determinations because the court otherwise stated in its opinion that it "accept[ed]" the opinions offered by Drs. Robinson and Barnas. To be sure, those experts opined that decedent did not have the testamentary capacity to execute the will on January 17, 2018, but Dr. Barnas did not begin to treat decedent until three months after

17

the will's execution and Dr. Robinson never met or evaluated decedent and based his opinion solely on a review of decedent's medical records, the complaint, and the certifications of the other doctors.

In our view, Daniel's reliance on the court's statement it had accepted the opinions of Dr. Robinson and Dr. Barnas is misplaced and is not based on a fair reading of the court's decision. Although the court stated that it accepted those opinions, in the next sentence the court plainly explained that it found the testimony of Miller, Gilbert, and Kuhl "more persuasive and of greater significance" than the testimony of Daniel's medical experts. In other words, the court had accepted the testimony of Daniel's medical experts but determined it was not as persuasive as that of the experienced lawyers who had spent a good part of a day with decedent and who testified decedent's words and actions demonstrated "[h]e knew what property he was disposing of and he knew who he was benefitting and that he was removing Daniel as [a] beneficiary." The court went further. It also expressly determined that the testimony was so persuasive that it provided clear and convincing evidence decedent possessed the requisite testamentary capacity when he executed the will.

Contrary to Daniel's suggestion in his brief on appeal, the court was not bound to accept the testimony of his experts because they were doctors. See In

18

re Halton's Est., 111 N.J. Eq. 143, 146 (Prerog. Ct. 1932) ("[T]he court is not obligated to accept the opinions of any witness or group of witnesses, medical or otherwise[,]" regarding "[a] decedent's mental capacity[.]"); see also Loveridge v. Brown, 98 N.J. Eq. 381, 385 (E. & A. 1925). "The question of testamentary capacity is one of fact to be determined by the court, and opinions, expert or otherwise, are mere aids to the court in reaching such determination but are in no sense binding." In re Halton, 111 N.J. Eq. at 146. The court was free to accept or reject the testimony of Daniel's experts and, in our view, the only fair reading of the court's decision makes manifest the court simply found the testimony of the individuals who spent January 17, 2018, with decedent more credible, persuasive and compelling than the testimony of the doctors.

For those reasons, we affirm the court's determination Daniel failed to present clear and convincing evidence overcoming the presumption that decedent had the requisite testamentary capacity to execute the will. Further, the court's affirmative finding that decedent possessed the requisite testamentary capacity is supported by substantial evidence the court found credible and persuasive. We reject Daniel's arguments to the contrary.

19

B.

Daniel next claims the court erred by determining decedent's execution of the will was not the product of undue influence exerted by Christopher. More particularly, Daniel asserts the court did not apply the correct legal standard in its analysis of his undue influence claim and, for that reason, we should reverse or remand the issue for further consideration and findings.

As noted, "[i]n any attack upon the validity of a will, it is generally presumed that 'the testator was of sound mind and competent when . . . execut[ing] the will.'" Haynes, 87 N.J. at 175-76 (quoting Gellert, 5 N.J. at 71). A will "may be overturned" where it is "tainted by 'undue influence.'" Ibid. "Undue influence, to vitiate a will, must be operative at the time the will is executed." Gellert, 5 N.J. at 76.

In a challenge to the validity of a will, "undue influence" is defined as a "mental, moral or physical exertion of a kind and quality that destroys the free will of the testator by preventing that person from following the dictates of his or her own mind as it relates to the disposition of assets[.]" In re Est. of Stockdale, 196 N.J. 275, 302-03 (2008); see also Haynes, 87 N.J. at 176. Undue influence "denotes conduct that causes the testator to accept the 'domination and

influence of another' rather than follow his or her own wishes." Stockdale, 196

N.J. at 303 (quoting In Re Neuman, 133 N.J. Eq. 532, 534 (E. & A. 1943)).

The analysis of an undue influence claim is governed by a well-established paradigm. The party challenging the will bears the burden of proving undue influence. In re Est. of Folcher, 224 N.J. 496, 512 (2016). However, where "the will benefits one who stood in a confidential relationship to the [testator] and there are additional circumstances of a 'suspicious character present which require explanation,'" Rittenhouse's Will, 19 N.J. 376, 378-79 (1955), a presumption of undue influence arises, and the burden of proof shifts to the proponent of the will "to overcome the presumption," Stockdale, 196 N.J. at 303, ordinarily by a preponderance of the evidence, see Haynes, 87 N.J. at 177-78 (explaining the preponderance of the evidence standard generally applies to undue influence claims arising from challenges to a will).[5]

---

[5] In Haynes, the Court otherwise noted the preponderance of the evidence standard does not apply, and instead, a "heavier burden of proof" applies to rebut a presumption of undue influence where "the presumption of undue influence is so heavily weighted with policy that the courts have demanded a sterner measure of proof than that usually obtaining upon civil issues." 87 N.J. at 178 (quoting In re Week's Est., 29 N.J. Super. 533, 539 (App. Div. 1954)). In Stockdale, the Court explained that where a challenger to a will establishes a confidential relationship and suspicious circumstances by a preponderance of the evidence, and thereby establishes a presumption of undue influence, the proponent of the

In its analysis of Daniel's challenge to the will, the court did not apply this well-established analytical framework to the undue-influence claim. The court instead erroneously found that for Daniel "to succeed" on his undue influence claim, he was required to first establish by clear and convincing evidence that Christopher had a confidential relationship with decedent and that there were attendant suspicious circumstances. The court therefore applied the incorrect legal standard—the more stringent clear-and-convincing standard—in concluding Daniel did not prove a confidential relationship and special circumstances such as to create a presumption of undue influence and shift the burden of proving the absence of undue influence to Christopher. See Stockdale, 196 N.J. at 303.

---

will may overcome the presumption "in accordance with the preponderance of the evidence standard," 196 N.J. at 303 (citation omitted).

Citing its holding in Haynes, the Court in Stockdale further explained that where the challenger to a will establishes a presumption of undue influence, the proponent of the will must overcome the presumption of undue influence by clear and convincing evidence where "the presumption arises from a 'professional conflict of interest on the part of an attorney, coupled with confidential relationships between a testator and the beneficiary as well as the attorney[.]'" Ibid. (citation omitted). That is because the existence of the attorney-client "relationship alone often results in both the shifting of the burden of proof and in the imposition of the heavier burden of clear and convincing evidence to rebut the presumption." Id. at 304. Here, it does not appear there are any similar circumstances warranting application of a "clear and convincing" burden of proof.

The court's application of the incorrect legal standard of proof to assess Daniel's undue-influence claim requires a remand for reconsideration of the issue by the trial court in the first instance. On remand, the court shall reconsider the issue, apply the preponderance of the evidence standard, and make appropriate findings of fact, R. 1:7-4, supporting its determination under the applicable legal principles.[6] Based on its findings and determination, the court may amend its final judgment on Daniel's challenge to the will if necessary and as appropriate. The court shall also permit the parties to offer additional written submissions addressing the undue-influence issue, and the court may conduct such additional proceedings as it deems appropriate for the proper resolution of the claim. Our decision to vacate the court's order rejecting the undue-influence claim and remand for reconsideration shall not be construed as expressing an opinion on the claim's merits.

---

[6] We note that in its discussion of Daniel's claim decedent lacked the testamentary capacity to execute the will, the court correctly explained that Daniel had the burden of establishing a lack of testamentary capacity by "clear and convincing evidence," see Hoover's Est., 21 N.J. Super. at 325, but noted that even if the standard required proof by only a preponderance of the evidence, Daniel had not satisfied that burden. The court did not make a similar finding in its analysis and reasoning supporting its rejection of Daniel's undue influence claim.

## C.

Daniel further contends the court erred by denying his request to admit into evidence three video clips that purportedly show decedent committing acts of domestic violence against Irene and Mark. Daniel contends the "best evidence rule dictates that" the clips should have been admitted to establish decedent had been acting in a manner supporting Daniel's expert's opinions that decedent suffered from impaired testamentary capacity.

The court did not sustain the objection to Daniel's request to admit the video clips under the Rules of Evidence. The court refused to admit the clips in evidence because Daniel had not timely identified them as exhibits in accordance with the timetable set forth in a pretrial case management order. The court also denied admission of the clips in evidence because it anticipated Daniel would otherwise testify about decedent's acts of physical domestic violence against Irene and Mark as depicted in the video clips. And, in fact, Daniel testified at trial concerning numerous incidents of physical violence by decedent on Irene and Mark, including the incidents depicted on the video clips, and the court noted in response to the testimony—which was unrebutted—that the video clips need not be admitted because they were cumulative.

A-3475-21

It is unnecessary to address the merits of Daniel's claim the court abused its discretion by denying his request to allow admission of the video clips in evidence. Even if the court erred by denying the request, the error was harmless, and harmless errors are not grounds for reversal on appeal. See Willner v. Vertical Realty, Inc., 235 N.J. 65, 79 (2018). "An error cannot be harmless if there is 'some degree of possibility that [the error] led to an unjust result.'" Ibid. (quoting State v. Lazo, 209 N.J. 9, 26 (2012) (alteration in original)), and Daniel makes no showing of any possibility the court's purported error led to an unjust result here.

To the contrary, the court permitted Daniel to describe in detail decedent's alleged numerous prior instances of physically assaultive behavior against Irene and Mark, and, as noted, the testimony was unrebutted. Moreover, the court clearly accepted Daniel's testimony that decedent had engaged in physically assaultive behavior prior to his execution of the will on January 17, 2018. In its findings of fact, the court affirmatively found decedent had become "very physically aggressive toward his wife and disabled son." Based on those circumstances, we discern no basis to conclude that any alleged error in denying Daniel's request to admit the three video clips in evidence was clearly capable

of producing an unjust result.  R. 2:10-2.  Any error was harmless and does not support a reversal of the court's order.  Willner, 235 N.J. at 79.

D.

In sum, we affirm the court's rejection of Daniel's claim decedent lacked the testamentary capacity to execute the January 17, 2018 will and vacate the court's order rejecting Daniel's claim the will was the product of undue influence exercised by Christopher.  We remand the undue-influence claim for reconsideration by the trial court in accordance with this decision and the applicable legal principles.  We further reject Daniel's contention that the court's order should be reversed because the court erred in barring the introduction of the video recordings.

Affirmed in part, vacated in part, and remanded for further proceedings in accordance with this opinion.  We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION